UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

PLANCK LLC, d/b/a, PATCH MEDIA,                    Case No. 20-cv-10959

                *Plaintiff*,

                                             **COMPLAINT**

    – against –

PARTICLE MEDIA, INC., d/b/a, NEWS BREAK,          **JURY TRIAL DEMANDED**

                *Defendant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

       Plaintiff PLANCK LLC, d/b/a, PATCH MEDIA ("Patch" or "Plaintiff"), by its attorneys,

Judd Burstein, P.C., as and for its Complaint against Defendant PARTICLE MEDIA, INC., d/b/a,

NEWS BREAK ("Defendant" or "News Break"), alleges as follows:


## JURISDICTION AND VENUE

       1.      This is a case of willful copyright infringement in violation of 17 U.S.C. §§ 106(1)

and 501, and for the removal and/or alteration of copyright management information under Section

1202(b) of the Digital Millennium Copyright Act.   As such, this Court has subject matter

jurisdiction under 17 U.S.C. § 101 *et seq*.; 28 U.S.C. § 1331 (federal question jurisdiction); and 28

U.S.C. § 1338(a) (jurisdiction over copyright actions).   This Court has pendent jurisdiction over

Plaintiff's claim for breach of contract pursuant to 28 U.S.C. § 1367.

       2.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2), because, as alleged

in detail *infra*, a substantial part of the events giving rise to the claims herein occurred in this

judicial district, and because the contract underlying Plaintiff's breach of contract claim against

Defendant requires the parties to litigate their disputes under that agreement in the "United States

federal and state courts in the Borough of Manhattan, New York[.]"   (*See* Exhibit A hereto at p. 2,

§ 10).

## PARTIES

3.      Plaintiff Patch is a limited liability company organized under the laws of the State of Delaware.  Some of its limited partners are citizens of the State of New York.  Plaintiff maintains offices in New York.

4.      Defendant News Break is a corporation organized under the laws of the State of Delaware, with its principal place of business in Santa Clara County, California.  At all times relevant to this action, it has engaged in a continuous and systematic course of business in New York State and has also transacted business in New York by operating the web sites for New Yorkers which is the basis for Plaintiff's claims in this action.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A.      PLAINTIFF'S BUSINESS AND REVENUE MODEL

#### (i)      Patch's Business

5.      Patch is a media news company which has pioneered digital local news content throughout the country.  It operates the patch.com website, which includes separate pages/portions of the site (referred to as "patches") throughout the United States, each of which provide hyper-local news, as well as event listings, classifieds, local weather, and other information of use and interest to its local readers.  By way of example using just three of Patch's 120 local pages in New York State, if one lives in the Chelsea area of Manhattan, there is a dedicated page for that neighborhood (https://patch.com/new-york/chelsea-ny); if one lives in Nyack, the operative page is found at https://patch.com/new-york/nyack; Albany residents can visit https://patch.com/new-york/albany-ny; and residents of the Bushwick area of Brooklyn can click on https://patch.com/new-york/bushwick.

6.      Each of these pages provides local news content down to the granular level of the reader's neighborhood.  For example, on December 14, 2020, the Bushwick Patch page, and the Chelsea Patch page both ran stories about the first New York recipient of the Covid-19 vaccine. However, whereas the Bushwick page highlighted a story about a string of robberies in Brooklyn, that story was not found on the Chelsea page.  The same is true for weather reports on December 14:  the bushwick page listed the temperature at 38 degrees, the temperature listed on the Chelsea page was 37 degrees, and the temperature listed on the Albany, New York Patch page was 36 degrees.

7.      Nationwide, Patch provides more than 1,200 distinct, local pages from Anchorage, Alaska, to Honolulu, Hawaii, to Burlington, Vermont, and in between, including approximately 120 geographic-specific, local news-based web sites throughout New York State alone.  It employs over 100 full-time journalists and close to 90 support and technical staff, all at great expense.

**(ii)     How Patch Earns Money**

8.      Patch makes its money predominantly by selling advertising space on its website and pages thereof.  Part of Patch's revenue model is akin to traditional media companies, which sell advertising based upon both the numbers and demographics of its readers or viewers.  Hence, a company will contract with Patch to run the same advertisement across a large number of its pages because it concludes that Patch serves an audience which is likely to include many potential customers for the advertiser's product.

9.      However, the major part of Patch's revenue comes from a unique aspect of the internet economy: the fact that, through the use of "cookies," advertising on a website or page of a website can be targeted on a micro-level down to individual visitors to that website or page.  A

"cookie" is a small text file that is stored on a user's web browser which consists of information

about a user's visit to a particular website or page.

      10.    As explained on the Federal Trade Commission's website, there are two types of

"cookies":

> **First-party cookies** are placed by the site that you visit. They can make your
> experience on the web more efficient. For example, they help sites remember:
>
>> items in your shopping cart
>>
>> your log-in name
>>
>> your preferences, like always showing the weather in your hometown
>>
>> your high game scores.
>
> **Third-party cookies** are placed by someone other than the site you are on. For
> example, the website may partner with an advertising network to deliver some of
> the ads you see. Or they may partner with an analytics company to help understand
> how people use their site. These "third party" companies also may place cookies in
> your browser to monitor your behavior over time.
>
> Over time, these companies may develop a detailed history of the types of sites you
> frequent, and they may use this information to deliver ads tailored to your interests.
> For example, if an advertising company notices that you read a lot of articles about
> running, it may show you ads about running shoes – even on an unrelated site you're
> visiting for the first time.

(Emphasis in original)

      11.    Patch's revenue is primarily driven by third-party cookies.  Hence, when a user

clicks on a Patch.com page, there is a virtual and split-second auction for the right to advertise to

that person based upon the information provided by third-party cookies.  Therefore, with the

exception of advertisements which, as noted, run across a large number of Patch's pages pursuant

to contract, each visitor to a Patch page sees individualized advertisements tailored to that visitor

based upon his or her visits to other websites.

12.     Both of Patch's revenue models, then, are driven by the number of visitors to its sites.  Those visitors are attracted in two primary ways.

13.     **First**, people find their way on to Patch.com pages through search engines such as Google, with the goal being that Patch finds itself at the top of a list of search results.  For example, if Patch ran a story about a crime committed in a community and someone conducted a Google search to learn about the crime, the Patch story would be at the top, or near the top, of the search results because it ran a substantive story about the crime.

14.     **Second**, Patch has mutually beneficial relationships with news aggregators such as Yahoo News or Google News.  A Patch headline might show up on the aggregator's website because cookies reveal the location of the user.  When the user then clicks on the Patch headline, he or she is taken directly to the appropriate Patch.com page.  This is a symbiotic relationship between Patch and the aggregator because the aggregator can sell advertising on its website, and Patch can also sell advertising on its page.  However, all that the user sees on the aggregator's website is the Patch headline for the story.

B.     **NEWS BREAK'S COMPETING BUSINESS**

15.     News Break commenced operations as an aggregator.  Over time, its business morphed into one that appears almost identical to Patch's by offering local news and weather pages throughout the country.  However, News Break obtains its content through the willful and unlawful exploitation and copying of Patch's and other publishers' original news articles and photographs for profit.  It alters, copies, and delivers to its customers substantial infringing excerpts from Patch stories, including copyrighted photographs.  Simply put, News Break is stealing Patch's hyper-local content, which Patch creates through its expertise and at its great expense.  Upon information

and belief, News Break then provides its customers with the ability to store these infringing materials locally and to further distribute them.

16.     In doing so, News Break provides a directly competing product for many Patch readers, who use Patch to monitor the news for breaking developments, with a particular focus on hyper-local news.  As a result, advertising revenue that would otherwise go to Patch as a result of Patch's economic investment and professional expertise is diverted to News Break.  In contrast, News Break bears only *de minimis* costs associated with its misappropriation of Patch's content. Additionally, upon information and belief, News Break has facilitated its infringing conduct by utilizing confidential information that Patch provided to it pursuant to a Non-Disclosure Agreement ("NDA").  (Exhibit A hereto is a true and accurate copy of the NDA).

17.     News Break's conduct is particularly galling because it has taken advantage of Patch's efforts to serve its communities during the Pandemic by permitting News Break a narrow verbal authorization to share Patch's content related to coronavirus – **but only coronavirus**.  In other words, after Patch agreed as a public service to share its content relating to the worst public health disaster that the United States has faced in a century, News Break abused the access Patch granted to it by then infringing any and all of Patch's content in order to enjoy the fruits of Patch's labors free of charge.

## C.    THE BUYOUT / INVESTMENT INQUIRY AND THE NDA

18.     In the Spring and Summer of 2019, News Break expressed an interest either to buy Patch, or to otherwise establish a mutually beneficial business relationship with it.  Toward that end, for Patch's protection, the parties entered into the NDA in July 2019, which provided in relevant part that Patch would convey confidential information concerning Patch to News Break. The NDA barred News Break from using any of the confidential information provided by Patch

for any purpose other than evaluating the possibility of a transaction between Patch and News Break.  (NDA, Exhibit A hereto, at § 1).  The NDA further confirmed that it did not grant "any rights to [News Break], by license or otherwise, to any of the [Patch] Information except as specified in" the NDA.  (*Id.*, § 11).  In particular, the NDA stated that "[n]othing in this Agreement shall be deemed to grant to either party a license under the other party's copyrights, patents, trade secrets, trademarks or other intellectual property rights."  (*Id.*)

19.     The buyout discussions did not result in a transaction or any other substantive business relationship.  In fact, upon information and belief, the entire process was a sham that News Break used to gain access to Patch's business secrets.

20.     In this connection, pursuant to the NDA, Patch provided News Break with confidential information, including, but not limited to, its business plan and technical processes. In reliance upon the NDA, Patch revealed to News Break how it sources hyper-local content and provided deep insights into its strategy for leveraging that investment in hyper-local content with search engines, thereby increasing Patch's traffic on, for example, Google.  Patch further shared with News Break its user-generated content features and revealed to News Break how specific Patch features drive its user engagement.

**D.     THE PANDEMIC ALTERS THE PARTIES' RELATIONSHIP**

21.     Patch's and News Break's negotiations did not result in the consummation of an agreement.  However, in the Winter of 2019-2020, Patch orally agreed with News Break that, as a public service, News Break could use Patch content concerning Covid-19.  This agreement was expressly limited to coverage that was directly related to Covid-19, and it contained other restrictions as well.  Specifically, Patch and News Break agreed (a) that News Break could only

obtain and publish coronavirus-related Patch content, and (b) that upon clicking any such headlines, users would be directed to Patch.com if they wanted to read the underlying article.

22.     Patch executives and technical specialists then worked with their counterparts at News Break to allow for News Break to access Patch's coronavirus content – and only coronavirus content.

E.     **NEWS BREAK'S UNLAWFUL ACTIVITIES**

23.     In violation of the parties' agreement, News Break began publishing Patch content that had nothing to do with coronavirus.  In addition, in publishing Patch content generally, News Break introduced intermediary "article" pages both on the Web and in its smart phone application, that it monetizes to Patch's detriment.  Hence, when an individual would click on a Patch story appearing on a News Break page, the reader would not, as required by Patch and News Break's oral agreement, be immediately re-directed to the actual Patch webpage where the article was published.  Instead, the user would be directed to an intermediate News Break page which contains the lead of the Patch story to which the user should have been taken after clicking the News Break link to the story. The user is then sent to the relevant Patch.com page only if he or she clicks a link stating "Read Full Story."

24.     Importantly, the Patch content on the News Break intermediate pages is not available in the news feeds that Patch provides to aggregators.  Rather, News Break improperly takes Patch's content for its own use and monetizes it in a manner that was never discussed, let alone agreed to or permitted by Patch.

25.     News Break's use of these intermediate pages improperly aids its business interests to Patch's detriment because, *inter alia*, (a) it often results in a competing search result on a site such as Google because News Break would appear also to be running a substantive story on the

subject of the search, thereby potentially leading the reader to News Break's page instead of Patch's, (b) it permits News Break to secure advertising revenue using Patch's copyrighted stories and photos, and (c) it undoubtedly results in many readers never clicking through to the Patch page because they have learned enough about the story from the Patch content on News Break's intermediate page.

26.     Further, upon information and belief, News Break is also allowing Google to crawl and index (as those terms are used in the industry) original Patch content on News Break's page, thereby deceiving Google into ranking News Break for the very content that it is stealing from Patch.  By doing so, News Break is able to siphon off Google search traffic that should legitimately go to Patch.

27.     Also, upon information and belief, News Break is representing to third parties that it has permission to pass along Patch content via feeds to other partners.  More specifically, News Break is using a video-generation platform to generate videos of Patch content.  News Break then represents to third parties that they can legitimately access that content through News Break, thereby cutting out Patch from the process and exploiting its feeds.  Patch provided no such rights to News Break.

28.     As part of its unlawful activities, News Break has infringed upon the following, duly registered Copyrights for photographs contained in Patch articles:

| | |
|---|---|
| a. | VA 2-221-794 |
| b. | VA 2-222-421 |
| c. | VA 2-221-693 |
| d. | VA 2-221-700 |
| e. | VA 2-221-701 |
| f. | VA 2-221-704 |
| g. | VA 2-221-627 |
| h. | VA 2-221-628 |
| i. | VA 2-222-424 |
| j. | VA 2-222-423 |

| | |
|---|---|
| k. | VA 2-221-784 |
| l. | VA 2-221-788 |
| m. | VA 2-221-791 |
| n. | VA 2-221-792 |
| o. | VA 2-221-632 |
| p. | VA 2-221-645 |
| q. | VA 2-221-650 |
| r. | VA 2-221-653 |
| s. | VA 2-221-782 |
| t. | VA 2-221-779 |
| u. | VA 2-221-786 |
| v. | VA 2-221-781 |
| w. | VA 2-221-785 |
| x. | VA 2-221-622 |
| y. | VA 2-221-625 |
| z. | VA 2-221-778 |
| aa. | VA 2-221-796 |
| bb. | VA 2-221-780 |
| cc. | VA 2-221-783 |
| dd. | VA 2-221-657 |
| ee. | VA 2-221-659 |
| ff. | VA 2-221-672 |
| gg. | VA 2-221-673 |
| hh. | VA 2-221-675 |
| ii. | VA 2-221-676 |
| jj. | VA 2-221-680 |
| kk. | VA 2-221-681 |
| ll. | VA 2-221-682 |
| mm. | VA 2-221-683 |
| nn. | VA 2-221-684 |
| oo. | VA 2-221-685 |
| pp. | VA 2-221-686 |
| qq. | VA 2-225-620 |
| rr. | VA 2-225-613 |
| ss. | VA 2-225-617 |
| tt. | VA 2-225-611 |
| uu. | VA 2-225-601 |
| vv. | VA 2-225-556 |
| ww. | VA 2-225-397 |
| xx. | VA 2-221-655 |
| yy. | VA 2-221-687 |
| zz. | VA 2-221-689 |
| aaa. | VA 2-221-691 |
| bbb. | VA 2-221-696 |
| ccc. | VA 2-221-698 |
| ddd. | VA 2-221-629 |

10

| | |
|---|---|
| eee. | VA 2-222-422 |
| fff. | VA 2-221-787 |
| ggg. | VA 2-221-654 |
| hhh. | VA 2-221-656 |
| iii. | VA 2-221-658 |
| jjj. | VA 2-221-678 |
| kkk. | VA 2-225-597 |
| lll. | VA 2-225-595 |
| mmm. | VA 2-225-564 |
| nnn. | VA 2-225-362 |
| ooo. | VA 2-225-395 |

29.     A true and accurate copy of a chart containing the dates of registration of the foregoing copyrights, the dates of the copyrighted photographs' publication in Patch, and various identifying information, and includes hyperlinks to the infringing articles on News Break is annexed hereto as Exhibit B.

30.     Plaintiff also seeks damages under the Digital Millennium Copyright Act because News Break has removed and/or altered copyright management information with respect to numerous Patch articles and photographs from material published on Patch's New York State-based feeds.  Annexed hereto as Exhibits C-K are compilations of true and accurate copies of articles as they appeared on various New York-based Patch feeds, followed by the versions of the articles as published on News Break, which removed and/or altered the copyright management information.  As set forth in Exhibits C-K hereto, the Patch Articles all provide credit for the author as well as the photographer.  By way of contrast, the News Break versions of the articles removed credit for authorship and photographs.  (*See id.*).[1]

---

[1]     We have used multiple exhibits because the materials are too voluminous to file as one exhibit.

31.     Upon information and belief, News Break has removed and/or altered copyright management information with respect to numerous additional Patch articles, both within its New York-based news feeds and also outside of Patch's New York-based feeds.

## PLAINTIFF'S FIRST CLAIM FOR RELIEF

### (Direct Copyright Infringement under 17 U.S.C. § 101 *et seq.*)

32.     Plaintiff repeats and realleges each and every allegation set forth above as if fully and completely set forth at length herein.

33.     The Registered Copyright Works are original works of authorship, embodying copyrightable subject matter, subject to the full protection of the United States copyright laws. Plaintiff owns the sole and exclusive right to sue under the copyrights in the Registered Copyright Works.

34.     Upon information and belief, as a result of Plaintiff's reproduction, distribution and public display of the Registered Copyright Works, Defendant had access to the Registered Copyright Works prior to the creation of Defendant's Infringing Works.

35.     By their actions, as alleged above, Defendant has infringed and violated Plaintiff's exclusive rights in violation of the Copyright Act, 17 U.S.C. § 501, by reproducing, distributing and publicly displaying the Infringing Works.

36.     Upon information and belief, Defendant's infringement of Plaintiff's copyrights is willful and deliberate, and Defendant has profited at the expense of Plaintiff.

37.     As a direct and proximate result of Defendant's infringement of Plaintiff's copyrights and exclusive rights in the Registered and Unregistered Copyright Works, Plaintiff is entitled to recover its actual damages from Defendant's uses of the Registered and Unregistered Copyright Works without paying license fees, in an amount to be proven at trial.  In addition, at

Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to recover damages based on a disgorgement of Defendant's profits from infringement of the Registered and Unregistered Copyright Works, which amounts will be proven at trial.

38.     In the alternative, and at Plaintiff's election, Plaintiff is entitled to maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to the infringing reproduction, distribution, and public display for each of the Registered Copyright Works, or such other amounts as may be proper under 17 U.S.C. § 504(c).

39.     Plaintiff is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

40.     Defendant's conduct has caused, and any continued infringing conduct will continue to cause irreparable injury to Plaintiff unless enjoined by this Court.  Plaintiff has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting infringement of Plaintiff's exclusive rights under copyright law.

## PLAINTIFF'S SECOND CLAIM FOR RELIEF

### (Violation of The Digital Millennium Copyright Act, 17 U.S.C. § 1202)

41.     Plaintiff repeats and realleges each and every allegation set forth above as if fully and completely set forth at length herein.

42.     Defendant has, on information and belief, intentionally removed copyright management information included on Plaintiff's display and publication of the Registered and Unregistered Copyright Works.

43.     Upon information and belief, Defendant removed and/or altered copyright management information knowing or having reasonable grounds to know that such actions would conceal its infringement of Plaintiff's copyright.

13

44.     Upon information and belief, Defendant provided and distributed false copyright management information on the Infringing Works in order to facilitate or conceal the infringement of Plaintiff's Registered and Unregistered Copyright Works.

45.     Upon information and belief, Defendant's acts in violation of the Digital Millennium Copyright Act were and are willful.

46.     By reason of Defendant's violations of the Digital Millennium Copyright Act, Plaintiff has sustained and will continue to sustain substantial injuries.

47.     Further irreparable harm is imminent as a result of Defendant's conduct, and Plaintiff is without an adequate remedy at law.  Plaintiff is therefore entitled to an injunction, in accordance with 17 U.S.C. § 1203(b)(1), restraining Defendant, its officers, directors, agents, employees, representatives, assigns, and all persons acting in concert with Defendant from engaging in further violations of the Digital Millennium Copyright Act.

48.     At its election, and in lieu of Defendant's profits derived from their violations of the Digital Millennium Copyright Act and Plaintiff's actual damages, Plaintiff is entitled to recover statutory damages in accordance with 17 U.S.C. § 1203(c)(3)(B).

49.     Plaintiff is entitled to recover costs and attorneys' fees in accordance with 17 U.S.C. §§ 1203(b)(4) and (5).

## PLAINTIFF'S THIRD CLAIM FOR RELIEF

### (Breach of Contract)

50.     The NDA is a valid and binding contract between the parties.

51.     Upon information and belief, Defendant breached the NDA by misappropriating Patch's confidential information that was provided to News Break pursuant to the NDA.

52.     Plaintiff has been damaged as a result of Defendant's breaches in an amount to be determined at trial.

53.     Additionally, the NDA provides for injunctive relief and Plaintiff is entitled to an injunction against Defendant's continued breaches.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A.      A declaration that Defendant has infringed Plaintiff's copyrights in the Registered Copyright Works under the Copyright Act;

B.      A declaration that such infringement is willful;

C.      An award of such of actual damages and profits under 17 U.S.C. § 504(b) as the Court shall deem proper or, at Plaintiff's election, an award of statutory damages as the Court shall deem proper, as provided in 17 U.S.C. § 504(c), including damages for willful infringement of up to $150,000 for each copyright infringement of the Registered Copyright Works;

D.      A declaration that Defendant has violated the Digital Millennium Copyright Act by intentionally removing copyright management information and intentionally providing and distributing false copyright management information to conceal infringement;

E.      Awarding Plaintiff all gains, profits, property, and advantages obtained or derived by Defendant from its acts of copyright infringement and violations of the Digital Millennium Copyright Act or, in lieu thereof, should Plaintiff so elect, such statutory damages as the Court shall deem proper, as provided in 17 U.S.C. § 1203(c)(3)(B), including damages up to $25,000 for each violation of the Digital Millennium Copyright Act;

15

F.   Awarding Plaintiff such exemplary and punitive damages as the Court finds appropriate to deter any future willful infringement;

G   Awarding Plaintiff its costs and disbursements incurred in this action, including its reasonable attorneys' fees, as provided in 17 U.S.C. §§ 505 and 1203(b)(5);

H.   Awarding Plaintiff interest, including pre-judgment interest, on the foregoing sums;

I.   Permanently enjoining Defendant, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all those in active concert and participation with Defendant, from:

(a)   directly or indirectly infringing Plaintiff's copyrights or continuing to market, offer, sell, dispose of, license, lease, transfer, publicly display, advertise, reproduce, develop, or manufacture any works derived or copied from the Plaintiff's Registered Copyright Works or to participate or assist in any such activity; and

(b)   directly or indirectly removing or altering any copyright management information from or providing or distributing any false copyright management information in connection with, Plaintiff's Registered and Unregistered Copyright Works;

J.   Awarding Plaintiff damages for Defendant's breach of contract; and

K.   For such other and further relief as the Court may deem just and proper.

### **JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Fed. R. Civ. P. 38.

16

Dated: New York, New York
December 28, 2020

Yours, etc.,

JUDD BURSTEIN, P.C.

By:   /s/ Judd Burstein
       Judd Burstein (JB9585)
       Peter B. Schalk (PS8257)
260 Madison Avenue, 15th Floor
New York, New York 10016
(212) 974-2400
(212) 974-2944 (Fax)
jburstein@burlaw.com
pschalk@burlaw.com
*Attorneys for Plaintiff*