UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

PLANCK LLC, d/b/a, PATCH MEDIA,                    Case No. 20-cv-10959 (LGS)

              *Plaintiff*,

                                   **FIRST AMENDED COMPLAINT**

    – against –

PARTICLE MEDIA, INC., d/b/a, NEWS BREAK,            **JURY TRIAL DEMANDED**
JEFF ZHENG, and VINCENT WU,

              *Defendants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

       Plaintiff PLANCK LLC, d/b/a, PATCH MEDIA ("Patch" or "Plaintiff"), by its attorneys, Judd Burstein, P.C., as and for its First Amended Complaint against Defendants PARTICLE MEDIA, INC., d/b/a, NEWS BREAK, JEFF ZHENG, and VINCENT WU (collectively, "Defendants"), which is filed as of right pursuant to Fed.R.Civ.P. 15(a) and the Court's Order of March 8, 2021 (Docket No. 26), alleges as follows:

## JURISDICTION AND VENUE

       1.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c) (violation of 18 U.S.C. § 1962(c)); 17 U.S.C. § 501(b) (copyright infringement); 17 U.S.C. § 1203(a) (violation of the Digital Millennium Copyright Act); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1338(a) (jurisdiction over copyright actions). This Court has pendent jurisdiction over Plaintiff's claims for breach of contract and fraudulent inducement pursuant to 28 U.S.C. § 1367. The Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. 1965 and CPLR 302.

       2.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2), because, as alleged in detail *infra*, a substantial part of the events giving rise to the claims herein occurred in this judicial district, and because the contract underlying Plaintiff's breach of contract claim against

Defendant Particle Media Inc., d/b/a, News Break ("News Break") requires the parties to litigate their disputes under that agreement in the "United States federal and state courts in the Borough of Manhattan, New York[.]"  (*See* Exhibit A hereto, a true and accurate copy of the contract in question (the "NDA"), which is incorporated herein by reference, at p. 2, § 10).  Venue also lies in this District pursuant to 18 U.S.C. § 1965(a).

## PARTIES

3.      Plaintiff Patch is a limited liability company organized under the laws of the State of Delaware.  Some of its limited partners are citizens of the State of New York.  Plaintiff maintains offices in New York.

4.      Defendant News Break is a corporation organized under the laws of the State of Delaware, with its principal place of business in Santa Clara County, California.  At all times relevant to this action, it has engaged in a continuous and systematic course of business in New York State and has also transacted business in New York by operating the web sites for New Yorkers which is the basis for Plaintiff's claims in this action.

5.      Defendant Jeff Zheng ("Zheng") is the founder and Chief Executive Officer ("CEO") of News Break.  As News Break's founder and CEO, Zheng has control over all material business decisions, which include the wrongful conduct alleged herein.

6.      Defendant Vincent Wu ("Wu") is the Chief Operating Officer ("COO") of News Break.  Upon information and belief, Wu was previously employed as the head of operations for the Huffington Post and Yahoo News, and he was recruited by Zheng for his expertise in the field.  Wu exerts extensive control over News Break's operations and was directly involved in much of the actionable conduct alleged herein.

2

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

A.    **PLAINTIFF'S BUSINESS AND REVENUE MODEL**

    (i)    **Patch's Business**

7.    Patch is a media news company which has pioneered digital local news content throughout the country.  It operates the Patch.com website, which includes separate pages/portions of the site (referred to as "patches") throughout the United States, each of which provide hyper-local news, as well as event listings, classifieds, local weather, and other information of use and interest to its local readers.  By way of example using just three of Patch's 120 local pages in New York State, if one lives in the Chelsea area of Manhattan, there is a dedicated page for that neighborhood (https://patch.com/new-york/chelsea-ny); if one lives in Nyack, the operative page is found at https://patch.com/new-york/nyack; Albany residents can visit https://patch.com/new-york/albany-ny;  and residents of the Bushwick area of Brooklyn can click on https://patch.com/new-york/bushwick.

8.    Each of these pages provides local news content down to the granular level of the reader's neighborhood.  For example, on December 14, 2020, the Bushwick Patch page and the Chelsea Patch page both ran stories about the first New York recipient of the Covid-19 vaccine.  However, whereas the Bushwick page highlighted a story about a string of robberies in Brooklyn, that story was not found on the Chelsea page.  The same is true for weather reports on December 14:  the Bushwick page listed the temperature at 38 degrees, the temperature listed on the Chelsea page was 37 degrees, and the temperature listed on the Albany, New York Patch page was 36 degrees.

9.    Nationwide, Patch provides more than 1,200 distinct, local pages from Anchorage, Alaska, to Honolulu, Hawaii, to Burlington, Vermont, and in between, including approximately

120 geographic-specific, local news-based web sites throughout New York State alone.  It employs over 100 full-time journalists and close to 90 support and technical staff, all at great expense.

**(ii)**      **How Patch Earns Money**

10.      Patch makes money by selling advertising space on its website and pages thereof. Part of Patch's revenue model is akin to traditional media companies, which sell advertising based upon both the numbers and demographics of its readers or viewers.  Hence, a company will contract with Patch to run the same advertisement across a large number of its pages because it concludes that Patch serves an audience which is likely to include many potential customers for the advertiser's product.

11.      Patch also generates a significant amount of revenue from programmatic advertising. Hence, when a user clicks on a Patch.com page, there is a virtual and split-second auction for the right to advertise to that person based upon the information provided by third-party "cookies."  "Cookies" are small text files that are stored on a user's web browser which consist of information about a user's visit to a particular website or page.

12.      Therefore, with the exception of advertisements which, as noted, run across a large number of Patch's pages pursuant to contract, each visitor to a Patch page sees individualized advertisements tailored to that visitor based upon his or her visits to other websites.

13.      Patch's revenue models, then, are driven by the number of visitors to its sites. Those visitors are attracted in three primary ways.

14.      **First**, people find their way on to Patch.com pages through search engines such as Google, with the goal being that Patch finds itself at the top of a list of search results.  For example, if Patch ran a story about a crime committed in a community and someone conducted a Google

search to learn about the crime, the Patch story would be at the top, or near the top, of the search results because it ran a substantive story about the crime.

15.     **Second,** Patch has its own email subscribers.

16.     **Third**, users link back to Patch through social media, *e.g.*, Facebook, and by news aggregators such as Yahoo News or Google News.  Thus, a Patch headline might show up on a social media page or an aggregator's website, and when the user then clicks on the Patch headline, he or she is taken directly to the appropriate Patch.com page.  There is a symbiotic relationship between Patch and the aggregator because the aggregator can sell advertising on its website, and Patch can also sell advertising on its page.  Generally, all the user sees on the aggregator's website or app is a Patch headline and short description.  However, at times, Patch will enter into a contractual relationship with an aggregator that allows the aggregator to surface additional material.  In such cases, it is standard industry practice that the aggregators pay the publishers for the right to syndicate their content.  Patch had no such contractual relationship with News Break.

## B.     <u>NEWS BREAK'S COMPETING BUSINESS</u>

17.     News Break commenced operations as an aggregator.  Over time, its business morphed into one that appears almost identical to Patch's by offering local news and weather pages throughout the country.  However, News Break obtains its content through the willful and unlawful exploitation and copying of Patch's and other publishers' original news articles and photographs for profit.  It alters, copies, and delivers to its customers substantial infringing excerpts from Patch stories, including copyrighted photographs.  Simply put, News Break is stealing Patch's hyper-local content, which Patch creates through its expertise and at its great expense.  Upon information and belief, News Break then provides its customers with the ability to store these infringing materials locally and to further distribute them.

5

18.    In doing so, News Break provides a directly competing product for many Patch readers, who use Patch to monitor the news for breaking developments, with a particular focus on hyper-local news.  As a result, advertising revenue that would otherwise go to Patch as a result of Patch's economic investment and professional expertise is diverted to News Break.  In contrast, News Break bears only *de minimis* costs associated with its misappropriation of Patch's content. Additionally, upon information and belief, News Break has facilitated its infringing conduct by utilizing confidential information that Patch provided to it pursuant to a Non-Disclosure Agreement, *i.e.*, the "NDA", which is Exhibit A hereto.

19.    News Break's conduct is particularly galling because it has taken advantage of Patch's efforts to serve its communities during the Pandemic by permitting News Break a narrow verbal authorization to share Patch's content related to coronavirus – **but only coronavirus**.  In other words, after Patch agreed as a public service to share limited content relating to the worst public health disaster that the United States has faced in a century, News Break abused the access Patch granted to it by then infringing any and all of Patch's content in order to enjoy the fruits of Patch's labors free of charge.

**C.    THE BUYOUT / INVESTMENT INQUIRY AND THE NDA**

20.    In the Spring and Summer of 2019, News Break expressed an interest either to buy Patch, or to otherwise establish a mutually beneficial business relationship with it.

21.    Toward that end, for Patch's protection, the parties entered into the NDA in July 2019, which provided in relevant part that Patch would convey confidential information concerning Patch to News Break.  The NDA barred News Break from using any of the confidential information provided by Patch for any purpose other than evaluating the possibility of a transaction between Patch and News Break.  (NDA, Exhibit A hereto, at § 1).  The NDA further confirmed

that it did not grant "any rights to [News Break], by license or otherwise, to any of the [Patch] Information except as specified in" the NDA. (*Id.*, at § 11). In particular, the NDA stated that "[n]othing in this Agreement shall be deemed to grant to either party a license under the other party's copyrights, patents, trade secrets, trademarks or other intellectual property rights." (*Id.*) The NDA also states in Section 13:

> No waiver, modification or amendment of any provisions of this Agreement shall be valid unless made in writing, signed by both parties, and specifying with particularity the nature and extent of such a waiver, modification or amendment. Any such waiver, modification or amendment shall, in no event, be construed to be a general waiver, abandonment, modification or amendment of any of the terms, conditions or provisions of this Agreement, but such waiver shall be strictly limited and restricted to the extent and occasion specified in such signed writing.

22.     The NDA was signed by Wu, News Break's COO, and Damian Noto ("Noto"), Patch's Vice President of Business Development.

23.     As part of the buyout discussions, Patch's President Warren St. John ("St. John") and Noto, met with Wu, Zheng, and others affiliated with News Break on August 14, 2019.

24.     The buyout discussions did not result in a transaction or any other substantive business relationship. In fact, upon information and belief, the entire process was a sham that News Break used to gain access to Patch's business secrets.

25.     In this connection, pursuant to the NDA, Patch provided News Break with confidential information, including, but not limited to, its business plan and technical processes. In reliance upon the NDA, Patch revealed to News Break how it sources hyper-local content and provided deep insights into its strategy for leveraging that investment in hyper-local content with search engines, thereby increasing Patch's traffic on, for example, Google. Patch further shared with News Break its user-generated content features and revealed to News Break how specific

Patch features drive its user engagement.  Patch provided News Break with information about how Patch sources, organizes, and distributes local content that News Break later used to inform its efficient thievery of Patch's content.

**D.    CONTINUED NEGOTIATIONS CONCERNING PATCH CONTENT**

26.    While Patch's and News Break's negotiations did not result in the consummation of a sale, News Break continued to pursue Patch.  In particular, in or around the fall of 2019, St. John engaged in discussion with Wu about Patch licensing to News Break Patch's copyrighted local election coverage and perhaps other content.  However, St. John insisted that any such licensing agreement be properly documented in writing.  Toward that end, on November 20, 2019, Ethan Fedida ("Fedida"), who was affiliated with News Break at the time, sent St. John a proposed "PREMIUM PUBLISHER PROGRAM LINKING AGREEMENT" ("Draft Publisher Agreement").  (Annexed hereto and incorporated herein by reference as Exhibit B is a true and accurate copy of Fedida's November 20, 2019 email with the attached Draft Publisher Agreement).

27.    The negotiation of the Draft Publisher Agreement was consistent with the parties' prior dealings concerning the NDA in that St. John, assisted by counsel, led the negotiations for Patch because the parties were discussing News Break's potential licensing of Patch content. Counsel for Patch prepared a redline version of the Draft Program Agreement ("Redline Draft Program Agreement") setting forth the changes required by Patch in order to move forward. (Annexed hereto and incorporated by reference herein as Exhibit C is a true and accurate copy of the Redline Draft Program Agreement).

28.    The Redline Draft Program Agreement demonstrates the detailed terms that Patch was insisting upon if it were to agree to share content with News Break.  For example, the provision concerning hyperlinks to Patch content was edited to provide that "(a) Content will not include

8

any categories and types of webpages and content specified by [Patch] from time-to-time; (b) the Link will link directly to the applicable Content on [Patch] Sites, without any modal or other interim page or content (i.e., it will take a single click from the Link to [Patch] Sites); and (c) [News Break] will remove any Link and/or Content from [its] Platforms within one (1) business day of written notice from [Patch]….”  (Exhibit C hereto at § 1.1).

29.    In other words, Patch was insisting that (a) it had the right to limit whatever type of content it would share with News Break, (b) if a user clicked on a Patch headline while on a News Break site, the user would immediately be re-directed to the corresponding Patch website, so that Patch would benefit from the user traffic,[1] and (c) on one day’s notice, News Break was required to remove any content that Patch directed it to remove.

30.    The redline also provided that News Break “will have no right to scrape [Patch] Sites for [Patch] Content or any other Content at any time, during or after the Term of this Agreement.” (*Id*., at § 1.8).  This meant that News Break was expressly forbidden from extracting content and data from a Patch website by “scraping” it, *i.e.*, using bots, or repetitive programs that operate on the Internet, to extract a website’s underlying Hyper Text Markup Language (“HTML code”).  Extracting the HTML code gives the scraper access to the actual data stored in a database, which enables it to replicate it on another website. Thus, if News Break scraped a Patch website, it could replicate the entire content from the Patch website on a News Break website, and not merely the content that Patch agreed to share with News Break or the public.  In reality, News Break’s business model depends upon scraping websites of various media outlets, including Patch, and then exploiting that stolen content for its own gain by posting it on a News Break website.

---

[1]     This requirement prevented News Break from siphoning off the traffic heading to Patch via an intermediate web page that could divert the user from Patch, the very tactic that News Break has illegally employed against Patch, as alleged in detail *infra*.

31.     The redline further confirmed that Patch retained all rights in its content other than those specifically granted (*id*., at § 3.1), and gave Patch audit rights with respect to the revenue sharing contemplated by the proposal (*id*., at § 4.5).

32.     Consistent with the NDA, the redline changed the California forum-selection clause that News Break had included in its draft to a New York forum selection clause.  (*Id*., at §§ 6.2, 6.3, 8.1).

33.     Patch and News Break did not reach an agreement regarding News Break's use of Patch's election coverage or other content in or around November 2019.

E.     **THE PANDEMIC ALTERS THE PARTIES' RELATIONSHIP**

34.     Talks between Patch and News Break resumed in the Winter and Spring of 2020 in connection with the coronavirus pandemic.  In particular, St. John orally agreed on behalf of Patch that, as a public service, News Break could use certain of Patch's Covid-19 content.  This agreement was expressly limited to coverage that was directly related to Covid-19.  It was also expressly agreed that upon clicking on any Patch headlines on News Break, users would be immediately directed to Patch.com if they wanted to read the underlying article.

35.     The parties' contemporaneous written communications confirm that News Break's license was limited to coronavirus coverage.  In this regard, on March 17, 2020, St. John sent Wu an email with the subject: "**Patch Covid feed**."  (*See* Exhibit D annexed hereto and incorporated herein by reference, which is a true and accurate copy of the relevant email chain, at St. John's email from March 17, 2020, at 10:30 AM) (emphasis supplied).  Thus, the very subject line of St. John's email confirmed that the topic in question was Patch's "Covid feed" -- not its general content.  St. John's same email contained a link to certain limited Patch coronavirus content.  (*See id.*).  The link did not provide the actual Patch articles, but rather only the following, limited

content relating to its coronavirus articles: (a) the headline, (b) a summary, (c) thumbnails, *i.e.*, reduced file-sized images used as placeholders, not the higher quality, larger photos accompanying an actual story, (d) a link that would allow an interested reader to access the full story on Patch, and (e) geographical information, specifically relating to zip codes, that would assist News Break in connecting users with relevant content based upon the users' location.

36.     Nevertheless, later on March 17, 2020, Wu responded that Patch's coronavirus "feed cannot be ingested by our tech system…." (Exhibit D hereto at Wu's email from March 17, 2020, at 7:20 PM). Following receipt of Wu's March 17, 2020 email, St. John proposed that he and Wu speak with a Patch developer the next day to address the problem with the feed. (*See* Exhibit D hereto at St. John's email of March 17, 2020, at 8:06 PM: "Can we jump on a call with one of my Devs tomorrow?"). St. John and Wu, among others, subsequently spoke about the feed. During these discussions, Wu stated that if Patch provided a general feed of headlines it would be easier for News Break's tech system to "ingest it," and News Break could then filter for and obtain the coronavirus content on its own.

37.     On March 18, 2020, in response to Wu's claim that News Break could not ingest Patch's coronavirus feed, St. John sent a new link that was not restricted to coronavirus, and inquired of Wu as follows: "can your team check this feed structure to see if it might work?  It isn't coronavirus only – it's all local news, but right now that's mostly coronavirus." (*See* Exhibit D hereto at St. John's email of March 18, 2020, at 2:13 PM). In so writing, St. John was asking if News Break could successfully "ingest" the data structure of the general feed. This was solely a technological question for an engineer and did not relate to or broaden the parties' agreement that Patch was only willing to share its coronavirus content with News Break. The agreement remained that if News Break could ingest the general feed from a technological standpoint, then it would

filter out everything but the coronavirus/Covid-19 content.  Furthermore, as was the case with the coronavirus feed, the general feed St. John provided did not give News Break actual Patch articles, but only limited information such as headlines, summaries, and thumbnails, with a link to the articles on Patch.com.

38.     Upon information and belief, News Break's representation that it could not utilize Patch's coronavirus restricted feed was false, and News Break intended for Patch to rely upon it to its detriment by (a) giving News Break access to Patch's general feed to assist News Break in scraping Patch's website and otherwise misappropriating Patch's copyrighted material content, and (b) inducing a Patch technical employee with no authority to negotiate licensing agreements to "click through" online to a contract of adhesion purporting to give News Break rights with respect to Patch content that News Break knew it did not have.  (*See* discussion *infra*).  This information and belief is based upon, *inter alia*, the following facts: (a) News Break is a technically sophisticated company, (b) its business model entails utilizing feeds from online news sources and it therefore has extensive experience in doing so, (c) News Break had a motive to fabricate in that it had been seeking to obtain Patch's unfiltered content since before the parties entered into the NDA, (d) based upon the confidential information Patch provided to News Break pursuant to the NDA, News Break was aware of the benefits associated with access to Patch's general feed, and (e) after it secured the general feed, News Break began using all of Patch's content and did not adhere to its agreement to only use Patch's coronavirus content.

39.     The task of coordinating News Break's access to Patch's feed was solely a technical one and did not concern the scope of the content News Break was authorized to use -- a matter on which Wu and St. John had already explicitly agreed would be limited only to coronavirus content.

Accordingly, solely in order to implement his oral agreement with Wu, St. John delegated the role of working with News Break to enable it to access Patch's feed to Marc Torrence ("Torrence").

40.     Torrence's responsibilities at Patch are technical in nature, and he has no executive or managerial authority.  Moreover, upon information and belief that is based on the surrounding facts and circumstances, News Break knew that Torrence had no executive authority at Patch.  In particular, St. John only assigned Torrence to work with News Break on technical issues after a substantive agreement had been reached.  Furthermore, in the same "Patch Covid feed" email chain where Wu claimed that News Break could not ingest Patch's coronavirus-only feed, St. John made clear that he had included Torrence in the email thread for the sole purpose of enlisting his technical assistance in addressing News Break's claimed difficulties with Patch's coronavirus feed.  Specifically, on March 18, 2020, St. John wrote Wu and others that he was "[a]dding Marc Torrence from Patch Product, to help us get you a feed that works for you."  (Exhibit D hereto at St. John's email of March 18, 2020 at 3:10 PM).

41.     Nevertheless, upon information and belief, in working with Torrence ostensibly to assist News Break in obtaining an "ingestible" feed, News Break advised Torrence that he would need to create a "publisher profile" and that to "submit" the publisher profile, Torrence had to "click through" online so as to accept a Terms of Service Agreement.  (A true and accurate copy of the Terms of Service Agreement as produced by News Break in this case is annexed hereto as Exhibit E and incorporated herein by reference).  Upon information and belief, there was no need for Torrence to set up the "publisher profile" and "click through" the Terms of Service Agreement to assist News Break with the feeds, and News Break tricked him into doing so to fabricate an excuse if its illegal conduct should come to light.  This information and belief is based, in part, on the facts that (a) News Break had been able to test the prior feeds from St. John without the need

for Patch to create a "publisher profile," and (b) when he claimed that News Break could not "ingest" the feed, Wu never mentioned the supposed "publisher profile" requirement to St. John, who Wu knew did have authority to negotiate, and who had insisted upon having input from counsel with respect to prior negotiations.

42.     The Terms of Services Agreement did not represent the parties' actual agreement about what Patch content News Break was authorized to use.  Rather, the Terms of Service Agreement purported to give News Break the unfettered right to use any and all Patch content with no restrictions as to subject-matter: "You hereby grant to [News Break] a non-exclusive license to publish [your content] on [News Break's Media Platform]."  (Exhibit E hereto at § 2).  The Terms of Service also purported to allow News Break (a) to advertise off of Patch's content, (b) use Patch's content to promote News Break's website, and even (c) share Patch's content with third-parties: "You agree that [News Break] may enable advertising on [News Break's Media Platform], including in connection with the display of [Patch] content….  We may also use [Patch] content to promote [News Break's Media Platform] or publish [Patch] content on the third-party platforms…."  (*Id*.).

43.     Remarkably, despite News Break having pursued an acquisition of Patch as well as a variety of other economic relationships -- all of which contemplated News Break compensating Patch for the use of its content -- the Terms of Services Agreement did not obligate News Break to pay Patch anything for the right to use and profit off of Patch's content in any manner that News Break saw fit.  (*See id. passim*).  Instead, the only supposed benefit the Terms of Service Agreement afforded Patch was increased visibility on the web: "We desire to work with You to help make Your news articles more visible and accessible to consumers."  (*Id*., at the third paragraph of the introduction).

14

44.     Upon information and belief, News Break knew that the Terms of Service Agreement did not reflect an actual agreement between it and Patch.  This information and belief is based upon, *inter alia*, the following facts: (a) the Terms of Service Agreement varied materially from the NDA and the Draft Program Agreement, (b) when the parties discussed potential licensing arrangements, executives from both companies exchanged drafts of heavily negotiated, written agreements, whereas (c) Torrence, a technical specialist, on information and belief, merely clicked through to the Terms of Services Agreement online while providing News Break with what was supposed to be technical assistance with the feed, (d) the earlier Draft Program Agreement as redlined contained detailed provisions to ensure revenue sharing which were absent from the Terms of Service Agreement, (e) Patch had no economic incentive to simply abandon the terms it had previously insisted upon before sharing content with News Break, and (f) the parties' written and oral communications post-dating the Terms of Service were inconsistent with that purported agreement, or indeed the existence of any agreement between Patch and News Break.  (*See infra* for allegations concerning these communications).

45.     Additionally, News Break contends that Torrence clicked through the Terms of Service Agreement on behalf of Patch on March 20, 2020.  Yet, on March 18, 2020, St. John had emailed News Break that he was only "[a]dding Marc Torrence from Patch Product, **to help us get you a feed that works for you.**"  (Exhibit D hereto at St. John's email of March 18, 2020, at 3:10 PM (emphasis supplied)).  Thus, a mere two days before Torrence supposedly granted News Break a free license to exploit all of Patch's content, St. John had expressly advised News Break in writing that Torrence's role was limited to providing technical assistance to help News Break get a working feed.

15

46.     In addition to purporting to grant News Break the right to use Patch's content free of charge, the Terms of Service Agreement also contains a California forum selection clause. However, the NDA (a) expressly states that News Break does not have a license to Patch's copyrights (*see* Exhibit A hereto at § 11), (b) contains a mandatory New York forum selection clause (*id.*, at § 10), and (c) provides that no modification shall be valid unless made "in writing, signed by both parties, and specifying with particularity the nature and extent of such a … modification or amendment" (*id.*, at § 13).  The Terms of Service Agreement does not reference the NDA or purport to modify any of its terms, and it was not signed by both parties to the NDA.

47.     Subsequent written communications demonstrate that News Break knew that Patch never agreed to the Terms of Service Agreement and that it did not govern the parties' relationship. In particular, on March 30, 2020, which is ten days after News Break contends that Torrence clicked through the Terms of Service Agreement on March 20, 2020, Wu emailed St. John as follows: "In addition to this collaboration effort, we'd like to see if Patch is open to license your content (full article) to News Break, as it provides a better user experience and as a result, we algorithm will automatically boost the readership of Patch stories.  We will share the ad revenue back to back (on a rev share model or fixed eCPM guaranteed)."  (*See* Exhibit F hereto, a true and accurate copy of this email chain, which is incorporated herein by reference, at Wu's email of March 30, 2020, at 1:08 PM).  If News Break already had a broad license under the Terms of Service Agreement to use Patch content for free, there would have been no reason for Wu to ask St. John if Patch would license its content to News Break, let alone offer to share ad revenue as an inducement.

48.     Thereafter, on May 14, 2020, Wu sent St. John another email stating in relevant part that

It took me a bit longer than expected to get back to you for News Break's proposal for the collaboration. Let me know your thoughts!

1. News Break hosts no more than 100 Patch articles per day from the metro patches, and share 80% of the ad revenue to Patch from the hosted Patch articles.

2. News Break provides a minimum guarantee on the eCPM or RPM (ad revenue per 1,000 page views) to Patch for the hosted articles.

3. News Break will promote Patch's stories from the headline section, push notifications, as well as other produce placements in the app.

4. For all the hosted Patch articles on News Break, the top-4 recirculation slots will be exclusively reserved for Patch stories and direct users to visit patch.com.

5. The total referrals to patch.com from News Break will be higher, or at least on the same level, with this max 100 hosted articles /day.

(*See* Exhibit G hereto, a true and accurate copy of this email chain, at Wu's email of May 14, 2020, at 6:59 AM).

49.    If News Break already had an all-encompassing license by virtue of the Terms of Service Agreement, Wu would not have sent this email which proposed limiting News Break to the use of 100 Patch articles a day, while offering a minimum guarantee on ad revenue.

50.    Wu did not copy Torrence on this email or on any other emails dealing with the business terms of any potential relationship between Patch and News Break.  On information and belief, Wu excluded Torrence from these communications because he understood that Torrence had no authority to make licensing decisions on behalf of Patch, and that any business arrangement had to be negotiated with St. John.  More importantly, as detailed below, Wu never alerted St. John to the existence of the Terms of Service Agreement.

51.    St. John did not respond to Wu's May 14, 2020 email.  Then, on June 23, 2020, Wu sent St. John a follow-up email inquiring about Patch's position regarding a business relationship with News Break.  (*See* Exhibit G hereto at Wu's email from June 23, 2020, at 11:29 AM).  St.

17

John replied to Wu's June 23, 2020 email by raising two issues, specifically, (a) his understanding that the parties had agreed to cap the number of Patch articles that could be hosted on News Break at 50, and (b) he asked for News Break's proposal for a guaranteed "CPM" on hosted content, which refers to the minimum fee paid to a website for 1,000 impressions of an ad. (Exhibit G hereto at St. John's email of June 23, 2020, at 8:33 AM). St. John further noted that "[i]f we can agree on these two points, you can send an agreement to review, etc." (*Id*.). If the Terms of Service Agreement governed the parties' relationship, St. John would not have asked for a written agreement to review if the parties came to terms on the number of articles and CPM.

52.    Wu did not respond to St. John by objecting that News Break already had a free license under the Terms of Service Agreement. In fact, Wu did not mention the Terms of Service Agreement at all. Instead, Wu wrote back the same day: "No problem! For hosted content, we're happy to provide a guarantee of $6 RPM of all the hosted page views from Patch. We can only host Patch content for metro areas. 50 articles/day is no problem either." (*Id*., at Wu's email of June 23, 2020 at 2:33 PM).

53.    These terms were not acceptable to Patch, and St. John did not respond to Wu's June 23, 2020 email. Thereafter, on August 13, 2020, Wu followed up again with St. John, asking if there was "[a]ny update on your side? Would like to see if we form a partnership together." (*See* Exhibit G hereto at Wu's email of August 13, 2020, at 10:57 AM). Based on this writing, upon information and belief, Wu knew that News Break did not have a general license to use Patch content as of August 13, 2020, because at that point in time, the parties only contemplated the possibility of forming a partnership together.

**F.**   **DEFENDANTS' UNLAWFUL ACTIVITIES RELATING TO COPYRIGHT**

54.   In violation of the parties' agreement, News Break began publishing Patch content that had nothing to do with coronavirus.  In addition, in publishing Patch content generally, News Break introduced intermediary "article" pages both on the Web and in its smart phone application, that it monetized to Patch's detriment.  Hence, when an individual would click on a Patch story appearing on a News Break page, the reader would not be immediately re-directed to the actual Patch webpage where the article was published.   Instead, the user would be directed to an intermediate News Break page which contains the lead of the Patch story to which the user should have been taken after clicking the News Break link to the story. The user is then sent to the relevant Patch.com page only if he or she clicked a link stating, "Read Full Story."

55.   Importantly, the Patch content on the News Break intermediate pages is not available in the news feeds that Patch provides to aggregators.  Rather, News Break improperly takes Patch's content for its own use and monetizes it in a manner that was never discussed, let alone agreed to or permitted by Patch.

56.   News Break's use of these intermediate pages improperly aids its business interests to Patch's detriment because, *inter alia*, (a) it often results in a competing search result on a site such as Google because News Break would appear also to be running a substantive story on the subject of the search, thereby potentially leading the reader to News Break's page instead of Patch's, (b) it permits News Break to secure advertising revenue using Patch's copyrighted stories and photos, and (c) it undoubtedly results in many readers never clicking through to the Patch page because they have learned enough about the story from the Patch content on News Break's intermediate page.

57.     Further, upon information and belief, News Break is also allowing Google to crawl and index (as those terms are used in the industry) original Patch content on News Break's page, thereby deceiving Google into ranking News Break for the very content that it is stealing from Patch.  By doing so, News Break is able to siphon off Google search traffic that should legitimately go to Patch.

58.     Also, upon information and belief, News Break is representing to third parties that it has permission to pass along Patch content via feeds to other partners.  More specifically, upon information and belief, News Break has represented to a third-party video generation platform that it can send Patch content to be used in automated local news videos.  News Break then represents to third parties that they can legitimately access that content through News Break, thereby cutting out Patch from the process and exploiting its feeds.  Patch granted no such rights to News Break.

59.     As part of its unlawful activities, News Break has infringed upon the following, duly registered Copyrights for photographs contained in Patch articles:

|     |               |
|-----|---------------|
| a.  | VA 2-221-794  |
| b.  | VA 2-222-421  |
| c.  | VA 2-221-693  |
| d.  | VA 2-221-700  |
| e.  | VA 2-221-701  |
| f.  | VA 2-221-704  |
| g.  | VA 2-221-627  |
| h.  | VA 2-221-628  |
| i.  | VA 2-222-424  |
| j.  | VA 2-222-423  |
| k.  | VA 2-221-784  |
| l.  | VA 2-221-788  |
| m.  | VA 2-221-791  |
| n.  | VA 2-221-792  |
| o.  | VA 2-221-632  |
| p.  | VA 2-221-645  |
| q.  | VA 2-221-650  |
| r.  | VA 2-221-653  |
| s.  | VA 2-221-782  |
| t.  | VA 2-221-779  |

| | |
|---|---|
| u. | VA 2-221-786 |
| v. | VA 2-221-781 |
| w. | VA 2-221-785 |
| x. | VA 2-221-622 |
| y. | VA 2-221-625 |
| z. | VA 2-221-778 |
| aa. | VA 2-221-796 |
| bb. | VA 2-221-780 |
| cc. | VA 2-221-783 |
| dd. | VA 2-221-657 |
| ee. | VA 2-221-659 |
| ff. | VA 2-221-672 |
| gg. | VA 2-221-673 |
| hh. | VA 2-221-675 |
| ii. | VA 2-221-676 |
| jj. | VA 2-221-680 |
| kk. | VA 2-221-681 |
| ll. | VA 2-221-682 |
| mm. | VA 2-221-683 |
| nn. | VA 2-221-684 |
| oo. | VA 2-221-685 |
| pp. | VA 2-221-686 |
| qq. | VA 2-225-620 |
| rr. | VA 2-225-613 |
| ss. | VA 2-225-617 |
| tt. | VA 2-225-611 |
| uu. | VA 2-225-601 |
| vv. | VA 2-225-556 |
| ww. | VA 2-225-397 |
| xx. | VA 2-221-655 |
| yy. | VA 2-221-687 |
| zz. | VA 2-221-689 |
| aaa. | VA 2-221-691 |
| bbb. | VA 2-221-696 |
| ccc. | VA 2-221-698 |
| ddd. | VA 2-221-629 |
| eee. | VA 2-222-422 |
| fff. | VA 2-221-787 |
| ggg. | VA 2-221-654 |
| hhh. | VA 2-221-656 |
| iii. | VA 2-221-658 |
| jjj. | VA 2-221-678 |
| kkk. | VA 2-225-597 |
| lll. | VA 2-225-595 |
| mmm. | VA 2-225-564 |

nnn.      VA 2-225-362

ooo.      VA 2-225-395

60.    Annexed hereto as Exhibit H and incorporated herein by reference is a true and accurate copy of a chart containing the dates of registration of the foregoing copyrights, the dates of the copyrighted photographs' publication in Patch, and various identifying information, and including hyperlinks to the infringing articles as they appeared on News Break as of the commencement of this action.

61.    Plaintiff also seeks damages under the Digital Millennium Copyright Act because News Break has removed and/or altered copyright management information with respect to numerous Patch articles and photographs from material published on Patch's New York State-based feeds.   Annexed hereto as Exhibits I-Q and incorporated herein by reference are compilations of true and accurate copies of articles as they appeared on various New York-based Patch feeds, followed by the versions of the articles as published on News Break, which removed and/or altered the copyright management information.   As set forth in Exhibits I-Q hereto, the Patch Articles all provide credit for the author as well as the photographer.   By way of contrast, the News Break versions of the articles removed credit for authorship and photographs.   (*See id.*).[2]

62.    Upon information and belief, News Break has removed and/or altered copyright management information with respect to numerous additional Patch articles, both within its New York-based news feeds and also outside of Patch's New York-based feeds.

63.    Upon information and belief that is based on the pervasive nature of News Break's infringement, which is chronic in scope and central to its business model, News Break provided the false copyright information set forth herein with the express intention of facilitating and

---

[2]      We have used multiple exhibits because the materials are too voluminous to file as one exhibit.

22

concealing its infringement.  Indeed, upon information and belief, News Break has a system in place in connection with its scraping operation that is designed to remove and/or alter copyright management information for the purpose of facilitating and concealing its infringing activities.

64.     The copyrighted materials infringed by Defendants as set forth above were not obtained by News Break through the feeds that St. John provided to it.  To the contrary, as alleged *supra*, those feeds did not give News Break actual Patch articles, but rather only limited content such as headlines, summaries, and thumbnails.  But News Break infringed the content contained in actual Patch Articles, not mere headlines or summaries, as well as Patch photographs, not mere thumbnails.  Accordingly, News Break had to obtain those materials from a different source than the feeds that Patch gave it, and upon information and belief, it did so by systematically scraping Patch's websites, a process that was assisted through News Break's fraudulent procurement of Patch feeds.  News Break further injured Patch by generating article summaries for their intermediate "article pages" using language and content that was not present in either the feeds St. John provided, or Patch's standard and public facing Really Simple Syndication ("RSS") feeds.  On information and belief, News Break systematically modifies the language in its intermediate "article pages" in order to deceive search engines like Google into erroneously crediting News Break with creating content that actually originated with Patch, and News Break simply stole.

65.     On information and belief, and as alleged in more detail below, all of News Break's infringing activity was directed by Zhen and Wu, each of whom knew that News Break was infringing Patch's copyrights and intended that it do so.

## PLAINTIFF'S FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### (Direct Copyright Infringement under 17 U.S.C. § 101 *et seq.*)

66.     Plaintiff repeats and realleges each and every allegation set forth above as if fully and completely set forth at length herein.

67.     The Registered Copyright Works are original works of authorship, embodying copyrightable subject matter, subject to the full protection of the United States copyright laws. Plaintiff owns the sole and exclusive right to sue under the copyrights in the Registered Copyright Works.

68.     Upon information and belief, either as a result of Plaintiff's reproduction, distribution and public display of the Registered Copyright Works, or by scraping Patch's websites, News Break had access to the Registered Copyright Works prior to the creation of the Infringing Works.

69.     By the actions, as alleged above, News Break has infringed and violated Plaintiff's exclusive rights in violation of the Copyright Act, 17 U.S.C. § 501, by reproducing, distributing and publicly displaying the Infringing Works.

70.     Upon information and belief, Defendants' infringement of Plaintiff's copyrights is willful and deliberate, and News Break profited from it at the expense of Plaintiff.

71.     Zheng and Wu actively directed and profited from News Break's infringement. Further, while they had the right and ability to stop the infringement, they knowingly chose not to do so.

72.     As a direct and proximate result of Defendants' infringement of Plaintiff's copyrights and exclusive rights in the Registered and Unregistered Copyright Works, Plaintiff is entitled to recover its actual damages from News Break's uses of the Registered and Unregistered

Copyright Works without paying license fees, in an amount to be proven at trial.  In addition, at Plaintiff's election, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to recover damages based on a disgorgement of News Break's profits from infringement of the Registered and Unregistered Copyright Works, which amounts will be proven at trial.

73.     In the alternative, and at Plaintiff's election, Plaintiff is entitled to maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to the infringing reproduction, distribution, and public display for each of the Registered Copyright Works, or such other amounts as may be proper under 17 U.S.C. § 504(c).

74.     Plaintiff is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

75.     Defendants' conduct has caused, and any continued infringing conduct will continue to cause irreparable injury to Plaintiff unless enjoined by this Court.  Plaintiff has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting infringement of Plaintiff's exclusive rights under copyright law.

### PLAINTIFF'S SECOND CLAIM FOR RELIEF AGAINST ZHENG AND WU

### (Racketeering in Violation of 18 U.S.C. § 1962(c))

76.     Plaintiff repeats and realleges each and every allegation set forth above as if fully and completely set forth at length herein.

### A.     THE RICO ENTERPRISE

77.     News Break (the "News Break Enterprise") is a RICO Enterprise in that it is a corporation.

**B.     MANAGEMENT AND CONTROL OF THE NEWS BREAK ENTERPRISE**

78.     At all times relevant to this Complaint, Zheng and Wu have managed and controlled the News Break Enterprise by reason of their management positions and Zheng's role as the founder of News Break.  Both Zheng and Wu actively participated in the sham buyout negotiations that lured Patch into disclosing trade secrets to News Break.  Wu was also engaged in negotiations regarding Patch's agreement to share its coronavirus content with News Break as a public service and used those negotiations to secure a general Patch feed which, on information and belief, facilitated News Break's misappropriation of Patch's content of its websites because it provided News Break with information that was helpful in its scraping of Patch's websites.

**C.     ZHENG AND WU HAVE ENGAGED IN A PATTERN OF RACKETEERING ACTIVITY**

79.     Zheng and Wu, through News Break, have engaged in "racketeering activity," as that term is defined by 18 U.S.C. § 1961(1), by willfully infringing Patch's copyrights for commercial advantage or private financial gain, all in violation of 18 U.S.C. § 2319.

80.     Defendants' violations of § 2319 are neither incidental nor accidental.  They are chronic and pervasive and lie at the core of News Break's business model, which consists of scraping websites to obtain content that News Break has no ability or commercially viable way to create (such as hiring local staff as Patch does), and then monetizing the misappropriated content through the News Break website.

81.     Thus, in addition to the numerous willful infringements of Patch's copyrights as alleged herein, Defendants, on information and belief, are engaging in the identical or similar violations of § 2319 against a variety of other media companies, including certain companies of which Patch is aware and will identify upon the Court entering a confidentiality order.  All of those

other copyright violations are additional racketeering acts which form the pattern of racketeering activity alleged herein.

82.     Moreover, at least two of Defendants' other victims have filed suit against it:

a.     First, Emmerich Newspapers Inc., has filed suit against News Break in the Southern District of Mississippi alleging similar violations of § 2319.   A true and accurate copy of the Complaint (the "Emmerich Complaint") filed by Emmerich Newspapers, Inc. is attached hereto and incorporated by reference herein as Exhibit R.  Each of the copyright infringements alleged in the Emmerich Complaint are also alleged here as additional acts of racketeering by Zheng and Wu.

b.     Second, Michael Grecco Productions, Inc., has filed suit against News Break in the Central District of California alleging similar violations of § 2319.  A true and accurate copy of the Complaint (the "Michael Grecco Complaint") filed by Michael Grecco Productions, Inc. is attached hereto and incorporated by reference herein as Exhibit S. Each of the copyright infringements alleged in the Michael Grecco Complaint are also alleged here as additional acts of racketeering by Zheng and Wu.

83.     Zheng and Wu's acts of racketeering constitute a "pattern of racketeering" within the meaning of 18 U.S.C. § 1961(5), because they are (a) vertically related, (b) horizontally related, and (c) they satisfy the requirement of open-ended continuity.

84.     The crimes are horizontally related because, *inter alia*, (a) they are all committed for the purpose of enriching Zheng and Wu by increasing News Break's profitability and preeminence on the web, (b) they have the same participants, (c) they are all committed through a concerted campaign of copyright infringement and scraping of websites, and (d) they all use News Break's website to commit their various crimes.

85.     Zheng and Wu's crimes are also vertically related because (a) they were able to commit their acts of racketeering by reason of their control over the News Break Enterprise's affairs, and (b) all of their criminal activity was related to the affairs of the News Break Enterprise.

86.     Zheng and Wu's racketeering activity poses a significant threat of continued activity because, on information and belief, they have engaged in it with respect to numerous victims.  This information and belief is based upon (a) News Break's misconduct with respect to Patch, (b) the Emmerich Complaint, (c) the Michael Grecco Complaint, and (d) other companies that are victims of News Break of which Patch is aware and will make known to the Court upon entry of a confidentiality order.  Further, the News Break Enterprise's entire racketeering scheme is premised upon the ongoing scraping and stealing of copyrighted material that News Break does not have the capacity to create itself.  Therefore, the News Break Enterprise must continue its racketeering activities, or it will not have sufficient content to post on the News Break website.

87.     In addition, Zheng and Wu (a) aided and abetted News Break's criminal copyright violations in that they each acted knowingly and willfully to aid in the crimes, with the intention of causing the crimes to be committed, and (b) conspired to violate § 2319.

**D.     PATCH HAS BEEN INJURED IN ITS BUSINESS AND PROPERTY**

88.     By reason of Zheng and Wu's racketeering activity they have caused and will continue to cause Patch to lose revenue and profits.

89.     The News Break Enterprise, as directed by Zheng and Wu, engaged in racketeering in violation of 18 U.S.C. § 1962(c).

90.     Patch has been injured in its business or property by virtue of the News Break Enterprise's racketeering activity in an amount to be determined at trial, then trebled, plus its reasonable attorneys' fees and expenses.

## **PLAINTIFF'S THIRD CLAIM FOR RELIEF AGAINST ZHENG AND WU**

### **(Conspiracy to Commit Racketeering in Violation of 18 U.S.C. § 1962(d))**

91.     In violation of 18 U.S.C. § 1962(d), Defendants Zheng and Wu agreed and conspired to violate 18 U.S.C. § 1962(c), by conspiring to participate in the affairs of the News Break Enterprise through a pattern of racketeering activity.  As such, they each knowingly agreed to facilitate the general criminal objective of the racketeering scheme which they undertook with News Break, intending that the specific acts of copyright infringement alleged above would be committed.

92.     Patch has been injured in its business or property by virtue of Zheng's and Wu's participation in this racketeering conspiracy in an amount to be determined at trial, then trebled, plus its reasonable attorneys' fees and expenses.

## **PLAINTIFF'S FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**

### **(Violation of The Digital Millennium Copyright Act, 17 U.S.C. § 1202)**

93.     Plaintiff repeats and realleges each and every allegation set forth above as if fully and completely set forth at length herein.

94.     News Break has, on information and belief, intentionally removed copyright management information included on Plaintiff's display and publication of the Registered and Unregistered Copyright Works.

95.     Upon information and belief, News Break removed and/or altered copyright management information knowing or having reasonable grounds to know that such actions would conceal its infringement of Plaintiff's copyright.

96.     Upon information and belief, News Break provided and distributed false copyright management information on the Infringing Works in order to facilitate or conceal the infringement of Plaintiff's Registered and Unregistered Copyright Works.

97.     Upon information and belief, News Break's acts in violation of the Digital Millennium Copyright Act were and are willful.

98.     Zheng and Wu had control over News Break's publications and personally benefited from the infringement.

99.     By reason of News Break's violations of the Digital Millennium Copyright Act, Plaintiff has sustained and will continue to sustain substantial injuries.

100.    Further irreparable harm is imminent as a result of News Break's conduct, and Plaintiff is without an adequate remedy at law.  Plaintiff is therefore entitled to an injunction, in accordance with 17 U.S.C. § 1203(b)(1), restraining News Break, its officers, directors, agents, employees, representatives, assigns, and all persons acting in concert with News Break from engaging in further violations of the Digital Millennium Copyright Act.

101.    At its election, and in lieu of News Break's profits derived from their violations of the Digital Millennium Copyright Act and Plaintiff's actual damages, Plaintiff is entitled to recover statutory damages in accordance with 17 U.S.C. § 1203(c)(3)(B).

102.    Plaintiff is entitled to recover costs and attorneys' fees in accordance with 17 U.S.C. §§ 1203(b)(4) and (5).

### PLAINTIFF'S FIFTH CLAIM FOR RELIEF AGAINST NEWS BREAK

#### (Breach of Contract)

103.     Plaintiff repeats and realleges each and every allegation set forth above as if fully and completely set forth at length herein.

104.     The NDA is a valid and binding contract between the parties.

105.     Upon information and belief, News Break breached the NDA by misappropriating Patch's confidential information that was provided to News Break pursuant to the NDA.

106.     Plaintiff has been damaged as a result of News Break's breaches in an amount to be determined at trial.

107.     Additionally, the NDA provides for injunctive relief and Plaintiff is entitled to an injunction against News Break's continued breaches.

### PLAINTIFF'S SIXTH CLAIM FOR RELIEF AGAINST NEWS BREAK

#### (Fraudulent Inducement)

108.     Plaintiff repeats and realleges each and every allegation set forth above as if fully and completely set forth at length herein.

109.     News Break made material, knowingly false representations to induce Patch to "click through" the Terms of Service Agreement.

110.     Patch detrimentally relied upon News Break's false representations.

111.     Plaintiff was damaged by News Break's fraudulent inducement in an amount to be determined at trial, or alternatively, is entitled to have the Terms of Services Agreement be rescinded or limited.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      A declaration that News Break has infringed Plaintiff's copyrights in the Registered Copyright Works under the Copyright Act;

B.      A declaration that such infringement is willful;

C.      An award of such actual damages and profits under 17 U.S.C. § 504(b) as the Court shall deem proper or, at Plaintiff's election, an award of statutory damages as the Court shall deem proper, as provided in 17 U.S.C. § 504(c), including damages for willful infringement of up to $150,000 for each copyright infringement of the Registered Copyright Works;

D.      A declaration that News Break has violated the Digital Millennium Copyright Act by intentionally removing copyright management information and intentionally providing and distributing false copyright management information to conceal infringement;

E.      Awarding Plaintiff all gains, profits, property, and advantages obtained or derived by News Break from its acts of copyright infringement and violations of the Digital Millennium Copyright Act or, in lieu thereof, should Plaintiff so elect, such statutory damages as the Court shall deem proper, as provided in 17 U.S.C. § 1203(c)(3)(B), including damages up to $25,000 for each violation of the Digital Millennium Copyright Act;

F.      Awarding Plaintiff such exemplary and punitive damages as the Court finds appropriate to deter any future willful infringement;

G      Awarding Plaintiff its costs and disbursements incurred in this action, including its reasonable attorneys' fees, as provided in 17 U.S.C. §§ 505 and 1203(b)(5);

H.    Awarding Plaintiff interest, including pre-judgment interest, on the foregoing sums;

I.    Permanently enjoining News Break, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all those in active concert and participation with News Break, from:

    (a)    directly or indirectly infringing Plaintiff's copyrights or continuing to market, offer, sell, dispose of, license, lease, transfer, publicly display, advertise, reproduce, develop, or manufacture any works derived or copied from the Plaintiff's Registered Copyright Works or to participate or assist in any such activity; and

    (b)    directly or indirectly removing or altering any copyright management information from, or providing or distributing any false copyright management information in connection with, Plaintiff's Registered and Unregistered Copyright Works;

J.    On its Second and Third Claims for Relief for violations of the RICO statute against Zheng and Wu, compensatory damages as determined at trial, then trebled, plus its reasonable attorneys' fees and expenses;

K.    On its Fifth Claim for Relief, awarding Plaintiff damages for News Break's breach of contract and appropriate injunctive relief;

L.    On its Sixth Claim for Relief, awarding Plaintiff damages for News Break's fraudulent inducement, or alternatively, a judgment rescinding or limiting the Terms of Services Agreement; and

M.    For such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury pursuant to Fed. R. Civ. P. 38.

Dated: New York, New York
March 17, 2021

                                 Yours, etc.,

                                 JUDD BURSTEIN, P.C.

                                 By: /s/ Judd Burstein
                                      Judd Burstein (JB9585)
                                      Peter B. Schalk (PS8257)
                                 260 Madison Avenue, 15th Floor
                               New York, New York 10016
                               (212) 974-2400
                               (212) 974-2944 (Fax)
                               jburstein@burlaw.com
                               pschalk@burlaw.com
                               *Attorneys for Plaintiff*

34