UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

PLANCK LLC, d/b/a, PATCH MEDIA,

Case No. 20-CV-10959 (LGS)

　　　　　*Plaintiff*,

　　　　– against –

PARTICLE MEDIA, INC., d/b/a, NEWS BREAK,
JEFF ZHENG, and VINCENT WU,

　　　　　　*Defendants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**PLAINTIFF PLANCK LLC, d/b/a, PATCH MEDIA'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS PARTICLE MEDIA, INC., d/b/a, NEWS BREAK,
JEFF ZHENG, AND VINCENT WU'S MOTION TO TRANSFER VENUE, OR
ALTERNATIVELY DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

JUDD BURSTEIN, P.C.
260 Madison Avenue, 15th Floor
New York, New York 10016
(212) 974-2400
*Attorneys for Plaintiff Planck LLC,
d/b/a, Patch Media*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION AND PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

POINT I

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

POINT II

THE TERMS OF SERVICES AGREEMENT DOES NOT REQUIRE DISMISSAL
OR A CHANGE OF VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.     Choice of Law Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.     The TSA's Forum Selection Clause Does Not Apply to Plaintiff's Claims. . . . . . 6

      C.     At Best, Defendants May Be Entitled to an Evidentiary Hearing to Determine
            Which Forum Selection Clause to Enforce. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      D.     Torrence Did Not Have Actual or Apparent Authority To Enter Into the TSA . . . 9

      E.     Patch Did Not Agree to the Forum-Selection Clause as a Matter of Law . . . . . . 17

POINT III

PLAINTIFF'S COMPLAINT DOES NOT FAIL TO STATE A CLAIM . . . . . . . . . . . . . . . . . . 19

      A.     The FAC Adequately States Copyright Based Claims . . . . . . . . . . . . . . . . . . . . . 19

      B.     The FAC Adequately States a Claim for RICO Violations . . . . . . . . . . . . . . . . . 20

      C.     The FAC Adequately States a Claim for Breach of Contract . . . . . . . . . . . . . . . . 25

      D.     The FAC Adequately States a Claim for Fraudulent Inducement . . . . . . . . . . . . 26

POINT IV

THE COURT HAS PERSONAL JURISDICTION OVER ZHENG . . . . . . . . . . . . . . . . . . . . . . 28

    A.    The Court Has Personal Jurisdiction Over Zheng Based on Patch's Copyright
Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    B.    The Court's Assertion of Personal Jurisdiction Over Zheng Comports with Due
Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    C.    Alternatively, Plaintiff is Entitled to Jurisdictional Discovery . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*1964 Realty LLC v. Consulate of the State of Qatar-New York*,
    No. 14 Civ. 6429 (ER), 2015 U.S. Dist. LEXIS 118547 (S.D.N.Y. September 4, 2015) .................. 16

*A.I. Trade Fin., Inc. v. Petra Bank*,
    989 F.2d 76 (2d Cir. 1993) ...................................................................................... 5, 34

*Airways Corp.*,
    903 F. Supp. 515 (S.D.N.Y. 1995) ........................................................................... 13

*Anna Sui Corp. v. Forever 21, Inc.*,
    07 Civ. 3235 (TPG), 2008 U.S. Dist. LEXIS 73457 (S.D.N.Y. Sep. 24, 2008) ........................... 29-31

*Applebaum v. Lyft, Inc.*,
    263 F. Supp. 3d 454 (S.D.N.Y. 2017) ...................................................................... 17

*Architecture v. Amir Constr.*,
    2006 U.S. Dist. LEXIS 111351 (C.D. Cal. December 8, 2006) ....................................... 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 5

*Asoma Corp. v. SK Shipping Co.*,
    467 F.3d 817 (2d Cir. 2006) ................................................................................. 8, 9

*Beatie & Osborn v. Patriot Scientific Corp.*,
    431 F. Supp. 2d 367 (S.D.N.Y. 2006) ..................................................................... 31

*Berkson v. Gogo LLC*,
    97 F. Supp. 359, 2015 U.S. Dist. LEXIS 46899 (E.D.N.Y. April 8, 2015) ........................... 6, 7, 18

*C&M Cafe v. Kinetic Farm, Inc.*,
    2016 U.S. Dist. LEXIS 161262 (N.D. Cal. November 18, 2016) ................................... 23, 24

*Colour & Design v. U.S. Vinyl Mfg. Corp.*,
    No. 04 Civ. 8332, 2005 U.S. Dist. LEXIS 10964, 2005 WL 1337864 (S.D.N.Y. June 3, 2005) ....... 32

*Commerce Funding Corp. v. Comprehensive Habilitation Servs.*,
    01 Civ. 3796 (PKL), 2005 U.S. Dist. LEXIS 2832 (S.D.N.Y. Feb. 24, 2005) ....................... 12

*Coop. Agricole Groupement de Producteurs Bovins de l'Ouest v. Banesto Banking Corp.*,
    No. 86 Civ. 8921 (PKL), 1989 U.S. Dist. LEXIS 8368 (S.D.N.Y. July 19, 1989) ................... 13

*Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*,
    829 F. Supp. 62 (S.D.N.Y. 1993) ......................................................................... 29, 30

*Empire Merchs., LLC v. Reliable Churchill LLLP*,
    902 F.3d 132 (2d Cir. 2018) ................................................................................. 24

*Enhancedcare, Inc. v. Attentive Health & Wellness, LLC*,
    2021 U.S. Dist. LEXIS 21631 (W.D.N.Y. Feb. 4, 2021) .............................................. 9

*FDIC v. Providence Coll.*,
   115 F.3d 136 (2d Cir. 1997) ........................................................................................ 14

*Fed. Hous. Fin. Agency v. Morgan Stanley ABS Capital I Inc.*,
   650291/2013, 2018 NY Slip Op 28067, 59 Misc. 3d 754 (Sup. Ct. Mar. 6, 2018) ............ 25

*Ford v. Unity Hospital*,
   32 N.Y. 2d 464 (1973) ................................................................................................... 10

*GE v. Compagnie Euralair, S.A.*,
   945 F. Supp. 527 (S.D.N.Y. 1996) ................................................................................. 26

*Glob. Beauty Grp., LLC v. Visual Beauty, LLC*,
   16 Civ. 9214 (KPF), 2018 U.S. Dist. LEXIS 23447 (S.D.N.Y. Feb. 12, 2018) ................ 28

*Grayson v. Ressler & Ressler*,
   271 F. Supp. 3d 501 (S.D.N.Y. 2017) ............................................................................. 5

*Hallock v. State of New York*,
   64 N.Y.2d 224 (1981) ................................................................................................... 10

*Hanover Architectural Serv., P.A. v. Christian Testimony-Morris, N.P.*,
   No. 2:10-5455(KM)(SCM), 2015 U.S. Dist. LEXIS 64298 (D.N.J. May 18, 2015) ........ 24

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*,
   2013 U.S. Dist. LEXIS 107552 (S.D.N.Y. 2013) ........................................................... 21

*Herbert Constr. Co. v. Cont'l Ins. Co.*,
   931 F.2d 989 (2d Cir. 1991) ......................................................................................... 10

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
   298 F.R.D. 116 (S.D.N.Y. 2014) ................................................................................... 25

*Iragorri v. United Techs. Corp.*,
   274 F.3d 65 (2d Cir. 2001) ............................................................................................. 5

*Kinstler v. Saturday Evening Post Co.*,
   507 F. Supp. 113 (S.D.N.Y. 1981) ............................................................................. 32-33

*Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*,
   528 Fed. Appx. 33, 2013 U.S. App. LEXIS 12639 (2d Cir. N.Y. June 20, 2013) ............ 9

*Lewis v. Jayco, Inc.*,
   2019 U.S. Dist. LEXIS 135448 (W.D. Va. August 12, 2019) .......................................... 9

*Jill Stuart (Asia) LLC v. Sanei Int'l Co.*,
   12 Civ. 3699 (KBF), 2012 U.S. Dist. LEXIS 161494 (S.D.N.Y. November 5, 2012) ........ 8

*Mango v. Buzzfeed, Inc.*,
   970 F.3d 167 (2d Cir. 2020) ......................................................................................... 19

*Marine Midland Bank, N.A. v. Miller*,
   664 F.2d 899 (2d Cir.1981) ............................................................................................. 5

*Minskoff v. Am. Express Travel Related Servs. Co.*,
   98 F.3d 703 (2d Cir. 1996) ................................................................................................ 11

*Norex Petroleum, Ltd. v. Access Indus.*,
   416 F.3d 146 (2d Cir. 2005) ................................................................................................ 5

*Palatkevich v. Choupak*,
   No. 12 Civ. 1682 (CM), 2014 U.S. Dist. LEXIS 10570 (S.D.N.Y. Jan. 24, 2014) ............ 22

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
   16 N.Y.3d 295 (2011) ....................................................................................................... 33

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
   609 F.3d 30 (2d Cir. 2010) ................................................................................................ 28

*Peter Rosenbaum Photography Corp. v. Otto Doosan Mail Order, Ltd.*,
   2005 U.S. Dist. LEXIS 21528 (BNA) 1759 ....................................................................... 20

*Peter Rosenbaum Photography Corp. v. Otto Doosan Mail Order, Ltd.*,
   No. 04 C 0767, 2005 U.S. Dist. LEXIS 21528(6) ............................................................. 22

*Phillips v. Audio Active, Ltd.*,
   494 F.3d 378 (2d Cir 2007) ................................................................................................ 7

*Primary Color Sys. Corp. v. Agfa Corp.*,
   2017 U.S. Dist. LEXIS 221512 (C.D. Cal. July 13, 2017) ................................................. 9

*Real Good Toys, Inc. v. Xl Mach., Ltd.*,
   163 F. Supp. 2d 421 (D. Vt. 2001) ................................................................................... 35

*Roberts v. Broadwayhd LLC*,
   No. 19 Civ. 9200 (KPF), 2021 U.S. Dist. LEXIS 24567 (BNA) 150, 2021 WL 467292 (S.D.N.Y.
   February 9, 2021) ............................................................................................................. 30

*Schaffer v. Litton Loan Servicing, LP*,
   2010 U.S. Dist. LEXIS 145933 (C.D. Cal. Oct. 18, 2010) ............................................... 16

*Star Funding, Inc. v. Tire Ctrs., LLC*,
   717 Fed. Appx. 38, 2017 U.S. App. LEXIS 26524 (2d Cir. N.Y. December 22, 2017) ..... 11

*Stevens v. CoreLogic, Inc.*,
   899 F.3d 666 (9th Cir. 2018) ............................................................................................ 19

*Strip Clean Floor Refinishing v. New York Dist. Council*,
   333 F. Supp. 385 (E.D.N.Y. 1971) ................................................................................... 14

*S'holder Representative Servs. LLC v. Medidata Sols., Inc.*,
   Civil Action No. 19-1312-RGA, 2020 U.S. Dist. LEXIS 35523 (D. Del. Feb. 24, 2020) ..... 25

*Tasini v. New York Times Co.*,
   206 F.3d 161 (2d Cir. 1999) ............................................................................................... 8

*Themis Capital, LLC v. Democratic Republic of Congo*,
  881 F. Supp. 2d 508 (S.D.N.Y. 2012) ............................................................. 13

*Unisys Corp. v. Pergament Distributors, Inc.*,
  No. 86-CV-4304 (ERK), 1991 U.S. Dist. LEXIS 2427 (E.D.N.Y. Feb. 11, 1991) .......................... 16

*United States Bank Nat'l Ass'n v. Ables & Hall Builders*,
  582 F. Supp. 2d 605 (S.D.N.Y. Oct. 27, 2008) ................................................. 16

*United States v. Bodin*,
  375 F. Supp. 1265, 1974 U.S. Dist. LEXIS 8645 (BNA) 345 (W.D. Okla. May 7, 1974) ................ 20

*United States v. Dadamuratov*,
  340 Fed. Appx. 540, 2009 U.S. App. LEXIS 16871 (11th Cir. Fla. July 28, 2009) .......................... 20

*United States v. Dove*,
  2008 U.S. Dist. LEXIS 31386 (W.D. Va. April 16, 2008) ................................................. 22

*United States v. Drebin*,
  557 F.2d 1316, 1977 U.S. App. LEXIS 12374 (BNA) 619 (9th Cir. Cal. July 21, 1977) ................ 20

*United States v. Frison*,
  825 F.3d 437 (8th Cir. 2016) .............................................................................. 24

*United States v. Gallo*,
  599 F. Supp. 241, 1984 U.S. Dist. LEXIS 21374 (BNA) 148 (W.D.N.Y. Dec. 10, 1984) ................ 20

*United States v. Wittich*,
  54 F. Supp. 3d 613, 2014 U.S. Dist. LEXIS 145784 (E.D. La. October 10, 2014) .......................... 22

*VFP Invs. I LLC v. Foot Locker, Inc.*,
  Index No. 152153/15, 2015 NY Slip Op 51554(U), 49 Misc. 3d 1210(A), 26 N.Y.S.3d 727 (Sup. Ct.,
  N.Y. Cty., Oct. 22, 2015) ................................................................................ 14

*Weisfelner v. Blavatnik*
  (In re Lyondell Chem. Co.), 543 B.R. 428 (Bankr. S.D.N.Y. 2016) .................................... 6

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980) .................................................. 34

STATUTES

17 U.S.C. § 1203 ....................................................................................................... 24

18 U.S.C. § 1961 ....................................................................................................... 20

28 U.S.C. § 1367 ......................................................................................................... 1

28 U.S.C. § 1404 ......................................................................................................... 1

CPLR § 302 .......................................................................................................... *passim*

Fed.R.Civ.P. 8 ........................................................................................................... 25

Fed.R.Civ.P. 9 ........................................................................................................... 26

Fed.R.Civ.P. 12 ........................................................................................................... 5

## INTRODUCTION AND PRELIMINARY STATEMENT

Plaintiff Planck LLC, d/b/a, Patch Media ("Plaintiff" or "Patch") respectfully submits this Memorandum of Law in opposition to the motion of Defendants Particle Media, Inc., d/b/a, News Break ("News Break"), Jeff Zheng ("Zheng") and Vincent Wu ("Wu") (collectively "Defendants") for an Order (a) under 28 U.S.C. § 1404(a), transferring this case to the Northern District of California, (b) pursuant to 28 U.S.C. § 1367(c)(3), dismissing Patch's Fifth Cause of Action for breach of contract for lack of supplemental jurisdiction, alternatively, (c) based on Federal Rule of Civil Procedure ("FRCP") 12(b)(6), dismissing Patch's First Amended Complaint ("FAC") for failure to state a claim upon which relief may be granted, and/or (d) under FRCP 12(b)(2), dismissing all claims against Zheng for lack of personal jurisdiction.

## STATEMENT OF FACTS

The FAC's key factual allegations are summarized as follows: Patch and News Break are competitors in the commercial space of localized Internet news. (FAC ¶¶ 7-18). However, at great expense, Patch creates its own content. (FAC ¶¶ 7, 9, 17). News Break, on the other hand, systematically steals its content from other creators while removing copyright information in an attempt to conceal its theft. (FAC ¶¶ 17-18; 80). Patch's principal place of business is in Manhattan, New York, and News Break's principal place of business is in California. (*See* accompanying April 13, 2021 Declaration of Warren St. John ("St. John Dec.") at ¶ 2; FAC ¶ 4). News Break was founded by Zheng, who recruited Wu to aid him in Defendants' corrupt pursuits. (FAC ¶¶ 5-6). Zheng and Wu profit handsomely off of News Break's business model which is premised upon copyright infringement, and they direct News Break's infringing activities, including in the New York forum. (FAC ¶¶ 5-6, 70-71, 79-80, 82, 84, 98).

In 2019, News Break expressed an interest in purchasing Patch or otherwise entering into a significant business relationship. (FAC ¶ 20). Toward that end, in July 2019, the parties entered into a Mutual Non-Disclosure Agreement ("NDA") which contained a mandatory New York forum selection clause and specifically provided that News Break had no license to Patch content, and that any change to these terms had to be contained in a writing signed by both parties that specifically referenced the provision to be modified. (FAC ¶ 21; Exhibit A to FAC at §§ 10, 11, 13). No business arrangement was consummated. (FAC ¶ 24). In reality, News Break had no interest in purchasing Patch and instead was engaged in a charade to secure Patch's confidential information to assist News Break in stealing Patch's content. (FAC ¶¶ 24-25).

In the fall of 2019, Patch and News Break entered into discussions about News Break possibly licensing Patch content. (FAC ¶ 26). While those discussions did not bear fruit, Patch once again insisted that any licensing agreement (a) contain a New York forum selection clause and (b) News Break paying Patch for any license to use its content. (FAC ¶ 26; Exhibit C to the FAC). In March 2020, Patch's President Warren St. John ("St. John") orally agreed to share Patch's Coronavirus content with News Break as a public service. (FAC ¶ 34). The limited scope of this agreement is reflected in the "Subject" of a March 17, 2020 email that St. John sent to Wu and others, which was: "Patch <u>Covid</u> Feed." (*See* Exhibit D to the FAC at p. 7 of the email chain) (emphasis supplied).[1] St. John also included in his March 17, 2020 email a link to an "RSS feed" that was limited to coronavirus coverage. (*Id*.; FAC ¶ 35). The term "RSS" is an industry-standard abbreviation for "Really Simple Syndication." An RSS feed allows users to receive automatically updated links to a publisher's web content together with the information (e.g., a summary of a

---

[1]     While Defendants dispute the limited scope of the license granted by St. John, they have no answer for this "subject" of St. John's March 17, 2020 email, and instead simply ignore it.

linked news article) which the publisher chooses to provide along with the link. *See* https://rss.com/blog/how-do-rss-feeds-work.

News Break then falsely claimed that it could not access the coronavirus feed and requested a generalized feed, while promising to separate out the coronavirus content. (FAC ¶¶ 36, 38). St. John assigned a technical specialist, Marc Torrence ("Torrence"), to assist News Break with the process. (FAC ¶ 39). News Break falsely represented to Torrence that News Break was unable to access the Coronavirus-limited materials which Patch had agreed to provide News Break unless Patch opened a News Break account by accepting News Break's Terms of Services Agreement ("TSA") online. (FAC ¶ 41; Exhibit D to the FAC at pp. 2-3; Torrence's April 13, 2021 Declaration ("Torrence Dec."), ¶ 6). In fact, the TSA was not needed for Torrence to complete his sole assignment of providing News Break with technical assistance so that it could obtain a feed of only Coronavirus-related content, and News Break never apprised Torrence that he was purportedly giving News Break all of Patch's content – its most valuable asset – for free, while also binding Patch to a mandatory California forum selection clause. (*Id.*; *see also* St. John Dec. ¶ 5). Torrence did not have actual authority to enter into the TSA. Patch also did not represent to any agent of News Break, or otherwise give it grounds to reasonably believe that Torrence had such authority. (FAC ¶ 40; Exhibit D to the FAC at p. 5 of the email chain; St. John Dec., ¶ 4; Torrence Dec. ¶ 3).

Thereafter, News Break repeatedly sought to purchase the same rights to Patch content that it had supposedly acquired free of charge under the TSA. (FAC ¶¶ 47-53; Exhibits F and G to the FAC). No agreement was reached and News Break instead proceeded to steal Patch's content in a calculated and egregious manner by scraping its websites and publishing the stolen material on

News Break's websites. (FAC ¶¶ 54-65 and Exhibits H-Q to the FAC).[2] News Break used the general RSS feed provided by Patch to more efficiently steal Patch's content. (FAC ¶ 38). Importantly, however, the stolen Patch content that News Break published was not obtained from the RSS feed that Patch provided to News Break. (FAC ¶ 64). Rather, the Patch content in the RSS feeds was more limited than what News Break published, and Defendants instead stole the infringed content directly from Patch websites. (*Id*.).

News Break's theft of Patch's content is not an isolated incident. Rather, News Break chronically steals content from a host of content providers by scraping their websites. (FAC ¶¶ 17, 54, 63, 80-82; Exhibits R and S to the FAC). News Break further creates interim web pages that contain portions of the stolen content that have been systematically manipulated to trick search engines such as Google into mistakenly crediting News Break with creating the content that it steals. (FAC ¶¶ 55-57, 64). At least two other content providers have already sued News Break for copyright infringement, and Patch is aware of additional providers whose content has been stolen by News Break at Zheng and Wu's direction that will be made known to the Court upon entry of a confidentiality order. (FAC ¶¶ 81-82; Exhibits R and S to the FAC). News Break has no ability to create its own content and could not continue to exist if it did not systematically steal others' content. (FAC ¶¶ 80, 86). As the founder and CEO of News Break, an entity whose modus operandi is to infringe copyrighted content, conceal its theft by removing copyright material, and

---

[2]    "Scraping" a website consists of using bots, or repetitive programs that operate on the Internet, to extract a website's underlying Hyper Text Markup Language ("HTML code"). Extracting the HTML code gives the scraper access to the actual data stored in a database, which enables it to replicate it on another website. Thus, if News Break scraped a Patch website, it could replicate the entire content from the Patch website on a News Break website, and not merely the content that Patch agreed to share with News Break or the public. (FAC ¶ 30).

then deceive search engines into crediting News Break with creating the stolen content, Zheng controls and benefits financially from the criminal infringement. (FAC ¶¶ 5, 70, 79).

## ARGUMENT

**POINT I:** **STANDARD OF REVIEW**

Defendants seek three distinct forms of relief here: (a) dismissal for failure to state a claim under Rule 12(b)(6); (b) dismissal or transfer for *forum non conveniens*; and (c) dismissal as to Zheng for a lack of personal jurisdiction under Rule 12(b)(2). Plaintiff is entitled to a generous standard of review for all three branches of Defendants' motion. The standard afforded a plaintiff opposing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is well known.[3]

Plaintiff also enjoys a generous standard with respect to the motion to transfer on *forum non conveniens* grounds. *See Norex Petroleum, Ltd. v. Access Indus.*, 416 F.3d 146, 154 (2d Cir. 2005). Here, however, Defendants do not perform a traditional *forum non conveniens* analysis. *See, e.g., Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001) (Identifying 3-step guide to be used in a *forum non conveniens* analysis). Instead, they rely entirely on the TSA's forum selection clause to support their motion to transfer venue.

Defendants' motion to dismiss for lack of personal jurisdiction also poses a low bar. As held in *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993):

> To survive the motion to dismiss, A.I. Trade was required to make only a *prima facie* showing that Petra Bank is amenable to personal jurisdiction in New York. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981). * * *

---

[3] The court "must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 513 (S.D.N.Y. 2017) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). To survive the motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Id.*).

[W]here the issue is addressed on affidavits,[4] all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party….

## POINT II: THE TERMS OF SERVICES AGREEMENT DOES NOT REQUIRE DISMISSAL OR A CHANGE OF VENUE

### A. Choice of Law Considerations

Defendants contend that the Court must apply California law based upon the TSA's California choice of law clause. They have put the cart before the horse:

> Relying on a contractual provision before a contract has been found to have been accepted by the parties as binding is unacceptable. "Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." *Schnabel v. Trilegiant Corp*., 697 F.3d 110, 119, 126-27 (2d Cir. 2012). *See also, e.g., Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008) ("[W]e cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract.")

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 387-388, 2015 U.S. Dist. LEXIS 46899, *47-48 (E.D.N.Y. April 8, 2015). As shown *infra*, the TSA is not a binding contract accepted by the parties. Consequently, California law does not govern the parties' dispute.

### B. The TSA's Forum Selection Clause Does Not Apply to Plaintiff's Claims

Defendants contend that with the exception of the FAC's claim for breach of the NDA, all of Plaintiff's claims arise from News Break's supposed services under the TSA. (Defendant's Memorandum of Law in Support ("Def's MOL") at 12). This is incorrect. Outside of Patch's fraudulent inducement claim, the FAC's claims arise under Copyright laws of the United States,

---

[4]    The Declarations submitted herewith are thus properly considered by the Court in connection with Plaintiff's opposition to Zheng's motion to dismiss on personal jurisdiction grounds. The declarations are also appropriately before the Court with respect to Plaintiff's opposition to Defendants' motion to transfer. *See, e.g., Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 428, 457 (Bankr. S.D.N.Y. 2016).

the RICO statute, and the NDA. In particular, Defendants' argument overlooks an important allegation in the FAC that the infringing materials were not provided to Defendants through the RSS feed that Torrence worked with News Break to establish. (*See* FAC ¶¶ 63-64). The gravamen of Patch's infringement allegations concern the scraping of Patch's websites to secure original content not contained in the RSS feeds; News Break's posting of the stolen Patch content on News Break's own websites; and the systematic manipulation of Patch's content on interim pages in order to trick search engines such as Google into crediting News Break with creating the Patch content that it stole. (*Id.*). The TSA contains no language purporting to authorize Defendants to obtain Patch's content on their own, whether by scraping Patch websites or otherwise, and then re-publish it. Indeed, the TSA is silent on the subject of how News Break would obtain Patch content. (*See* Exhibit E to the FAC *passim*). Moreover, the parties' actual course of dealing only involved Patch providing News Break with a workable RSS feed that did not contain "actual Patch articles, but rather only limited content such as headlines, summaries, and thumbnails." (FAC ¶ 64).

Under these circumstances Patch's infringement and RICO claims do not arise out of News Break's supposed services under the TSA. To the contrary, it is Defendants who raise the TSA as a defense to Patch's claims. Therefore, even if the TSA were a valid contract, and it is not, its forum selection clause would not govern here. *See Phillips v. Audio Active, Ltd.*, 494 F.3d 378, 391 (2d Cir 2007) ("Because the recording contract is only relevant as a defense in this suit, we cannot say that Phillips' copyright claims originate from, and therefore 'arise out of,' the contract.") (Holding that copyright infringement claims were not governed by a contract's forum selection clause).

Defendants seek to distinguish *Phillips* by arguing that the interpretation of their license is the determinative factor regarding Plaintiff's claims. (Def's MOL at 13). They are mistaken

because, as discussed above, Patch alleges conduct by News Break that would not be permissible even if the TSA were an enforceable contract (which is not the case). As the Court explained in *Tasini v. New York Times Co.*, 206 F.3d 161, 170-171 (2d Cir. 1999):

> [T]he fact that a party has licensed certain rights to its copyright to another party does not prohibit the licensor from bringing an infringement action where it believes the license is exceeded or the agreement breached. *See Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 932 (2d Cir. 1992) ("If a breach of a condition is alleged, then the district court has subject matter jurisdiction."). Rather, where an author brings an infringement action against a purported licensee, the license may be raised **as a defense**.

(Citation omitted; emphasis supplied); s*ee also Jill Stuart (Asia) LLC v. Sanei Int'l Co*., 12 Civ. 3699 (KBF), 2012 U.S. Dist. LEXIS 161494, at *14-16 (S.D.N.Y. November 5, 2012) ("[T]hat defendants are engaging in unlicensed uses of plaintiffs' trademarks and copyrights is a claim for infringement, not breach of contract.") (*Citing* cases). Thus, here, as in *Phillips*, because Defendants raised the TSA as a defense to Patch's copyright claims, its forum selection clause would not control even if the TSA agreement were a binding contract.

## C.   At Best, Defendants May Be Entitled to an Evidentiary Hearing to Determine Which Forum Selection Clause to Enforce

Assuming, *arguendo*, that the TSA were binding, the Court would be presented with conflicting forum selection clauses by reason of the NDA's mandatory New York forum selection clause. (*See* Exhibit A to the FAC at § 10). The main Second Circuit decision on conflicting forum selection clauses is *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 822-23 (2d Cir. 2006), which held that

> Where, as here, the two sides have put forth different contracts, each containing a forum selection clause designating a different forum, and the parties do not dispute the facts which gave rise to those two conflicting contracts, the court must decide as a matter of law on the agreed facts which forum selection clause governs. Once the parties agree on the facts, the issue is no longer one of burden of proof, the issue is one of law which the court must decide.

(*Id.*, at 822-23).

Unlike *Asoma Corp.*, in this case, there are material facts in dispute in connection with the TSA. In applying the general principles of *Asoma*, the Second Circuit held in *Lazare Kaplan Int'l Inc. v. KBC Bank N.V.* that "[t]he district court ... erred in failing to analyze properly the applicability of each forum selection clause to the various aspects of this litigation, as required by *Asoma*, and instead proceeding directly to a *forum non conveniens* analysis." 528 Fed. Appx. 33, 35, 2013 U.S. App. LEXIS 12639, *4, 2013 WL 3064857 (2d Cir. N.Y. June 20, 2013) (Remanding for further proceedings). In light of this authority, if the Court were to conclude that the TSA was duly entered into, an evidentiary hearing would be indicated to determine the controlling forum selection clause. The alternative approach, to engage in piecemeal litigation by severing the claims covered by the NDA from those arising under the TSA, is disfavored.[5]

## D. Torrence Did Not Have Actual or Apparent Authority To Enter Into the TSA

Torrence lacked the actual authority to bind Patch to the TSA. Instead, as alleged in the FAC, Torrence was a technical specialist who was given a limited assignment by Patch's President, St. John, to assist News Break in obtaining an ingestible feed. (*See* FAC at ¶¶ 39-40; St. John Dec. ¶ 3-4; Torrence Dec. ¶¶ 4-5).

---

[5]    *See Enhancedcare, Inc. v. Attentive Health & Wellness*, LLC, 2021 U.S. Dist. LEXIS 21631, *18-19, 2021 WL 388763 (W.D.N.Y. Feb. 4, 2021) ("when faced with two or more conflicting forum selection clauses, federal courts are loath to enforce all of them out of concern for wasting judicial and party resources") (quoting *Samuels v. Medytox Sols., Inc.*, No. 13-CV-7212, 2014 U.S. Dist. LEXIS 125525, 2014 WL 4441943, at *4, *7-8, *10 (D.N.J. Sept. 8, 2014) (internal quotation marks omitted)). *See also Lewis v. Jayco, Inc.*, 2019 U.S. Dist. LEXIS 135448, *7-8, 2019 WL 3797357 (W.D. Va. August 12, 2019) (In the interest of efficiency and to avoid duplicative litigation, the court only enforced one competing forum selection clause); *Primary Color Sys. Corp. v. Agfa Corp.*, 2017 U.S. Dist. LEXIS 221512, *17, 2017 WL 8220729 (C.D. Cal. July 13, 2017) ("In the interest of justice, the Court will not enforce both forum selection clauses and divide this action. Instead, the Court enforces only one forum-selection clause.")

9

Moreover, the Court should reject News Break's attempt to rely upon the doctrine of apparent authority. (*See* Def's MOL at p. 11). Contrary to Defendants' position, "[o]ne who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority." *Ford v. Unity Hospital*, 32 N.Y. 2d 464, 472 (1973) (citation omitted). To successfully rely upon a theory of apparent authority, Defendants must establish that "(1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question and (2) the third party reasonably relied on the representations of the agent." *Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993-94 (2d Cir. 1991) (internal citations and quotation marks omitted).

> As explained by the New York Court of Appeals in *Hallock v. State of New York*:
>
> Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority. Rather, the existence of "apparent authority" depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal – not the agent. Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable[.]

64 N.Y.2d 224, 231 (1981) (citations and some internal quotation marks omitted).

Here, Defendants can point to no act or words on the part of St. John or any other senior executive at Patch which could have led News Break to reasonably conclude that Torrence had authority to enter into any contracts on behalf of Patch, let alone one with the significance of the TSA. In fact, the opposite is true considering that St. John introduced Torrence to Wu and News Break as follows: "[a]dding Marc Torrence from Patch Product, to help us get you a feed that works for you." (*See* FAC at ¶ 40 and Exhibit D thereto at St. John's email of March 18, 2020 at

3:10 PM). Thus, far from misleading News Break, St. John clearly delineated Torrence's role as being limited to helping Patch provide a working feed.

Similarly, Torrence himself did not mislead News Break as to the scope of his authority. (*See* Torrence Dec. at ¶ 3). But regardless, nothing Torrence said or did could result in a finding that he had apparent authority to enter into the TSA: "[a]pparent authority ... cannot be established by the actions or representations of the agent." *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (citation omitted).

Faced with a dearth of words or conduct on the part of Patch to support the notion that it cloaked Torrence with apparent authority to enter into the TSA, Defendants latch on to his job title of "Senior Product Manager." (*See* Def's MOL at 11). But Torrence's job title is not understood in the industry to convey the requisite authority to bind a principal to a legal contract. (St. John Dec. ¶ 4; Torrence Dec. ¶ 2). In all events, Torrence's job title provides Defendants with no comfort in light of the Second Circuit's decision in *Star Funding, Inc. v. Tire Ctrs., LLC*:

> Since TCi gave Powell the title of "Business Development Manager," Star argues that TCi cloaked Powell with the apparent authority to enter into the purchase orders. * * * Here, Powell's job title reflects that he was not a TCi officer, director, or executive who had apparent authority to bind the company, and Star conceded to the district court that it lacked evidence that it was the "common practice and custom" for Business Development Managers to purchase tires in any amount, let alone millions of dollars worth of them[.] * * * Accordingly, Star has presented no evidence to establish that TCi engaged in misleading conduct.

717 Fed. Appx. 38, 41-42, 2017 U.S. App. LEXIS 26524, *7-9, 2017 WL 6550417 (2d Cir. N.Y. December 22, 2017). Here too, Torrence was not a director, officer, or executive with apparent authority to enter into an agreement licensing Patch content to News Break, or contract away the NDA's New York forum selection clause. (St. John Dec. ¶ 4; Torrence Dec. ¶ 2).

The surrounding facts and circumstances further confirm that News Break could not have reasonably relied on Torrence's supposed authority. In this connection, the NDA was negotiated

11

with the input of senior personnel at Patch and was signed by Damian Noto ("Noto"), Patch's Vice President of Business Development. Following the NDA's execution, Patch's President, St. John, and Noto both participated in the buyout negotiations with Zheng and Wu who represented News Break. (FAC at ¶ 23). Thus, Defendants knew that St. John, not Torrence, was the principal at Patch with whom they had to negotiate a material transaction. News Break further engaged in discussions in the Fall of 2019 with St. John – not Torrence – about Patch licensing to News Break Patch's copyrighted local election coverage and perhaps other content. (FAC at ¶ 26). In the context of those discussions, News Break provided St. John – again, not Torrence – with a proposed "PREMIUM PUBLISHER PROGRAM LINKING AGREEMENT." (FAC at ¶ 26 and Exhibit B thereto). Thus, the parties' prior course of dealing was entirely inconsistent with the notion that Torrence would step in to negotiate the TSA with no input from St. John. *Commerce Funding Corp. v. Comprehensive Habilitation Servs.*, 01 Civ. 3796 (PKL), 2005 U.S. Dist. LEXIS 2832, *64, 2005 WL 447377 (S.D.N.Y. Feb. 24, 2005), is on point:

> CHS contends that, because Dr. Attanasio reported directly to Muise and was "entrusted with most of the responsibility of overseeing" CHS's administration of the clinics, it was reasonable for CHS to rely on Dr. Attanasio's authorization of the rate increase. (CHS's Objections, at 4.). However, Muise was the contact point for all things financial at St. Francis and she took the lead in the initial negotiation of CHS's fees. (Tr. 185, 236-37.) She was also the "primary administrative contact" for CHS. (Tr. 178.) * * * Dr. Attanasio was the Director of Communications Disorders who ensured that CHS properly administered its medical services. It does not follow that Dr. Attanasio would have a say in authorizing a rate increase.

The unreasonableness of News Break's reliance upon Torrence's apparent authority is all the more evident in light of the significance of the transaction. Pursuant to the TSA, Torrence was, *inter alia*, supposedly providing News Break with a license to use any and all of Patch's content. (*See* Exhibit E to the FAC at § 2; *see also* St. John Dec. at ¶ 5: "Patch's content, which is created with professional expertise and at great expense, is our most valuable asset."). Furthermore, while

News Break had repeatedly sought to license Patch content by offering to pay for it, the TSA purported to give away Patch's content for no monetary remuneration whatsoever. (*See* Exhibit E to the FAC *passim*).[7] The forum selection clause was also a material term for Patch considering that (a) the NDA contained a New York forum selection clause (Exhibit A to the FAC at § 10), (b) in the redlined version of the "PREMIUM PUBLISHER PROGRAM LINKING AGREEMENT," Patch's counsel excised the California forum selection clause and replaced it with a New York forum selection clause (FAC at ¶ 32 and Exhibit C thereto at §§ 6.2, 6.3, 8.1), and (c) St. John averred that "[b]ecause Patch is headquartered in New York City, I have insisted on a New York forum selection clause for all formal dealings with [News Break]." (St. John Dec. ¶ 2).

In light of the materiality of the transaction embodied in the TSA, News Break had a duty to inquire before it could reasonably rely upon Torrence's apparent authority.[8] "The more extraordinary the transaction, ... the more reasonable becomes a greater degree of inquiry into the status of the apparent agent." *Coop. Agricole Groupement de Producteurs Bovins de l'Ouest v. Banesto Banking Corp.*, No. 86 Civ. 8921 (PKL), 1989 U.S. Dist. LEXIS 8368, at *46 (S.D.N.Y.

---

[7] Indeed, it is arguable that the TSA is void for lack of consideration from News Break.

[8] *See Themis Capital, LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508, 528 (S.D.N.Y. 2012):

Under the doctrine of apparent authority, there is a duty to inquire into the status of an agent's authority when "(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud." *[Republic of] Benin* [*v. Mezi*, No. 06 Civ. 870 (JGK)], 2010 U.S. Dist. LEXIS 93848, 2010 WL 3564270, at *7 [(S.D.N.Y. Sep. 8, 2010)](citing *FDIC v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997)). "[T]he duty of inquiry amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal." *C.E. Towers Co. v. Trinidad and Tobago (BWIA Int'l) Airways Corp.*, 903 F. Supp. 515, 525 (S.D.N.Y. 1995) (quoting *Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 995-96 (2d Cir. 1991)).

July 19, 1989) (citation omitted).  *FDIC v. Providence Coll.*, 115 F.3d 136 (2d Cir. 1997), is on

point.  There, the Second Circuit reversed a district court's finding after an evidentiary hearing

that apparent authority existed because the extraordinary nature of the transaction gave rise to

inquiry notice:

> Even if we accept all of the district court's findings, including the College's
> preference among contractors, we still conclude that the guaranty transaction at
> issue was novel and extraordinary, and therefore one that put the bank on inquiry
> notice as to Byron's apparent authority. * * *
>
> If a transaction is novel or extraordinary for a particular institution, it raises the
> eyebrow even if it is entered into for a vital purpose.  Ultimately, the question is
> whether the particular transaction falls within the range of transactions in which
> Providence or similarly situated institutions normally engage.

*Id.*, at 141-42 (citation omitted).

The unreasonableness of News Break's purported reliance is further apparent here, where

St. John introduced Torrence to Wu by email as the person who would help provide a workable

feed.  (FAC at ¶ 40 and Exhibit D thereto at p. 5 of the email chain).  Thus, all Wu had to do was

reply to St. John's email to inquire about whether Torrence had the authority to negotiate with

News Break regarding the TSA.  *See VFP Invs. I LLC v. Foot Locker, Inc.*, Index No. 152153/15,

2015 NY Slip Op 51554(U), ¶ 3, 49 Misc. 3d 1210(A), 26 N.Y.S.3d 727 (Sup. Ct., N.Y. Cty., Oct.

22, 2015) ("VFP merely had to contact Foot Locker's accounting department to learn that Smith

and Rainier were not authorized to verify receivables.").

Indeed, "the principal will not be bound by the act of his agent in excess of his actual

authority where the party doing business with the agent knows the extent of the latter's

authority...."  *Strip Clean Floor Refinishing v. New York Dist. Council*, 333 F. Supp. 385, 396

(E.D.N.Y. 1971) (citations omitted).  Here, it is at least a fair inference that News Break knew full

well that Torrence lacked the requisite authority to bind Patch to the TSA.  In addition to the facts

detailed above, long after the TSA was purportedly entered into by Torrence, Wu pursued St. John – not Torrence – in an effort to secure rights to Patch's content that the TSA had already purportedly licensed to News Break.[9]

This course of conduct is inconsistent with the notion that Torrence had bound Patch to the TSA. Nor can News Break explain away these facts by arguing that Wu's continued negotiations concerned an expansion of the rights supposedly granted by the TSA. (*See* Def's MOL, p. 8: "Wu and St. John continued to email about further expanding the relationship – in particular, with a license to News Break for Patch's *full articles*." (emphasis in original)). That is no answer, because the license purportedly granted by TSA did not restrict News Break to using less than Patch's "full articles." (*See* Exhibit E to the FAC at § 2). Accordingly, if News Break truly understood that the TSA governed the parties' relationship, Wu would have had no need to attempt to secure Patch's agreement to allow News Break to use a maximum of 50 Patch articles a day for a specific minimum revenue share – because it already had a free license to that content, and more.

Based on the foregoing, and without the benefit of discovery, the undeveloped record contains compelling proof that Wu and News Break knew that Torrence lacked authority to bind Patch to the TSA, and would instead need to obtain approval from St. John: "[T]he evidence ... established that Pergament knew that Michael Fields did not have the authority to bind Burroughs and it understood that Pl.Ex.A and the side letters would have to be submitted by Fields for

---

[9]     *See, e.g.,* (a) Exhibit F to the FAC, Wu's March 30, 2020 email to St. John asking whether "Patch is open to license your content (full article) to News Break" in exchange for which News Break would "share the ad revenue," (b) Exhibit G to the FAC, Wu's May 14, 2020 email to St. John proposing that News Break be authorized to use a maximum 100 articles daily in exchange for certain guaranteed minimum revenues, and (c) Exhibit G to the FAC at Wu's email to St. John of June 23, 2020 at 2:33 PM, in which he proposed limiting News Break to 50 Patch articles a day for proposed revenue sharing.

approval and execution by his superiors[.]" *Unisys Corp. v. Pergament Distributors, Inc.*, No. 86-CV-4304 (ERK),1991 U.S. Dist. LEXIS 2427, *4, 1991 WL 29965 (E.D.N.Y. Feb. 11, 1991).

As shown above, News Break could not have reasonably relied on Torrence's apparent authority to enter into the TSA. But in all events, the issue of Torrence's apparent authority is not a question that can be decided **against Patch** on a motion to dismiss. *See United States Bank Nat'l Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605, 610-11 (S.D.N.Y. Oct. 27, 2008) (Holding with regard to apparent authority questions that "[s]uch fact-intensive inquiries would require discovery and the issues thus may not be resolved on a motion to dismiss.") (Citation omitted).[10]

"Ultimately, the Second Circuit has stressed that 'reasonable reliance is often a question of fact for the jury rather than a question of law for the court.'" *1964 Realty LLC, supra*, at *38 (*quoting STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011)) (some citations and internal quotation marks omitted). Therefore, at a minimum, an evidentiary hearing would be required for the Court to conclude that Torrence possessed the apparent authority to bind Patch to the TSA.[11]

---

[10]    *See also 1964 Realty LLC v. Consulate of the State of Qatar-New York*, No. 14 Civ. 6429 (ER), 2015 U.S. Dist. LEXIS 118547, at *38-39, 2015 WL 5197327 (S.D.N.Y. September 4, 2015) ("Given the lack of clarity as to Defendant's representations leading up to the execution of the Agreement and Al-Rumaihi's general duties, the Court believes additional discovery is necessary in order to resolve the issue of apparent authority....") (*Citing Themis Capital, LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508, 526-531 (S.D.N.Y. 2012)).

[11]    As shown above, the Court should not apply the TSA's California choice of law provision before determining that the TSA is binding. Nevertheless, an evidentiary hearing would also be required under California law to decide the question of Torrence's apparent authority:

> [U]nder California law, assuming, as the Saulniers suggest, that class counsel lacked actual authority to enter into the settlement, there is insufficient evidence in the present record to find that counsel had apparent authority to bind the Saulniers to the settlement with Litton. * * * [T]he court defers ruling on Litton's motion to enforce the Settlement Agreement, and will conduct an evidentiary hearing to resolve the factual disputes.

### E. Patch Did Not Agree to the Forum-Selection Clause as a Matter of Law

Relying upon *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454 (S.D.N.Y. 2017), News Break contends that when Torrence "clicked through" to consent to the TSA, Patch agreed to the California forum selection clause as a matter of law. (*See* Def's MOL at 9-10). However, *Applebaum* is entirely inapposite here, because the plaintiff there was not contending that he did not have the authority to electronically sign an agreement to which he was a party. In other words, Torrence's "click through" is meaningless if he did not have actual or apparent authority to do so.

Further, Defendants have misread *Apfelbaum* by suggesting that a "click-through" consent ends all inquiry. To the contrary, the Court defined the issue as whether "[e]valuating the totality of the circumstances, a reasonably prudent consumer would not have been on inquiry notice of the terms….," and then invalidated one of the agreements at issue in the case. *Id.*, at 466-67. Here, Defendants cannot pass the totality of the circumstances test because Torrence was simply carrying out a limited technical assignment he received from Patch's President to assist News Break in securing an ingestible feed. These circumstances afforded Torrence with no notice whatsoever that he was at risk of binding his employer to litigate any disputes arising from News Break's services in California, let alone licensing away Patch content for free. To the contrary, as also discussed *infra* in the section on fraudulent inducement, News Break affirmatively misled Torrence.

News Break also ignores a key component of the totality of relevant facts and circumstances at play here, namely, that the NDA contains a mandatory New York forum selection clause. (*See* Exhibit A to the FAC at p. 2, § 10). Moreover, the NDA states in Section 13 that

*Schaffer v. Litton Loan Servicing, LP*, 2010 U.S. Dist. LEXIS 145933, *42-45 (C.D. Cal. Oct. 18, 2010).

"[n]o waiver, modification or amendment of any provisions of this Agreement shall be valid unless made in writing, signed by both parties, and specifying with particularity the nature and extent of such a waiver, modification or amendment." (*Id*. at p. 2). Additionally, in the Redline Draft Program Agreement, Patch's counsel replaced a California forum selection clause contained in News Break's version with a New York forum selection clause consistent with the NDA. (FAC ¶ 32). In light of the repeated care Patch took to ensure that any dispute with News Break would be litigated in New York, it is not reasonable to conclude as a matter of law that Patch was on notice that it was agreeing to a California forum when Torrence clicked through the TSA. This is especially so when any change to the NDA's forum selection clause had to be in writing, signed by both parties, and to state the change with particularity – as opposed to some click through agreement on the Internet. Thus, News Break has not met its burden here:

> The burden should include the duty to explain the relevance of the critical terms governing the offeree's substantive rights contained in the contract. *See generally* Nancy S. Kim, *Wrap Contracts: Foundations and Ramifications 211* (2013) ("Courts justify wrap contracts by claiming that the nondrafting party manifested consent, but their construction of what constitutes manifestation of consent has wandered too far from the truth."); *see also Specht* [*v. Netscape Communs. Corp.*,] 306 F.3d [17,] 31-32, 35 [(2d Cir. 2002)] ("We are not persuaded that a reasonably prudent offeree in these circumstances would have known of the existence of [the company's] terms. Plaintiffs were responding to an offer [on the internet] that did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms. . . . We conclude that in circumstances such as these . . . a reference to the existence of [] terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms. . . . Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.").

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 382 (E.D.N.Y. 2015).

# POINT III: PLAINTIFF'S COMPLAINT DOES NOT FAIL TO STATE A CLAIM

## A. The FAC Adequately States Copyright Based Claims

Defendants do not contend that absent the alleged license granted by the TSA, Plaintiff fails to state a claim for copyright infringement. (Def's MOL pp. 19-21). Nor could they credibly do so in light of Plaintiff's detailed allegations identifying the Copyrights in question and the acts of infringement. (*See* FAC ¶¶ 54-60 and Exhibit H thereto). As shown above, the TSA is not a binding contract and it cannot bar Plaintiff's infringement claims, certainly as a matter of law. Plaintiff's copyright claim therefore stands.

With regard to the DMCA claim, Defendants' only argument outside of their reliance upon the TSA is that Plaintiff failed adequately to allege scienter, *i.e.*, that News Break knew (a) that it was posting copyright photos without credits, and (b) that doing so would assist in its infringement. (*See* Def's MOL at 23-24 (citing *Mango v. Buzzfeed, Inc.*, 970 F.3d 167 (2d Cir. 2020) and *Stevens v. CoreLogic, Inc.*, 899 F.3d 666 (9th Cir. 2018)). It is unclear why Defendants cite *Mango*. Putting aside that *Mango* is procedurally inapposite because it concerned an appeal from a trial, not a motion to dismiss for failure to state a claim, the Second Circuit in *Mango* rejected the position that Defendants take here: "BuzzFeed argues that it cannot be held liable under the DMCA because there was no evidence that it knew its conduct would lead to future, third-party infringement of Mango's copyright. We hold that the DMCA does not require such evidence and affirm the judgment of the district court." (*Id.*, at 169). *Mango* also shows why Defendants' reliance upon *Stevens* is erroneous:

> BuzzFeed relies on the Ninth Circuit's decision in *Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018), to argue that the district court erred by failing to require evidence that BuzzFeed had constructive knowledge of likely future, third-party infringement. *Stevens*, however, does not help BuzzFeed here. Unlike Mango, the plaintiffs in *Stevens* did not allege – let alone prove – an underlying claim of

copyright infringement that would support the knowing concealment of either that infringement or another.

*Mango*, at 173.  In this case, the FAC <u>does</u> assert a claim for copyright infringement.  Regardless, the FAC adequately alleges scienter, in that Patch alleges that Defendants' DMCA violations go hand in glove with Defendants' copyright violations, because the removal of the copyrighted material is done intentionally and systematically to conceal the infringement.  (FAC ¶ 63).

## B.    The FAC Adequately States a Claim for RICO Violations

Defendants begin by noting that courts should be wary of copyright claims being dressed up as RICO claims.  (Def's MOL at 24-25).  That generic point does not speak to whether the actual FAC filed in this action states a RICO claim.  It does.

Defendants next argue that the FAC fails to allege any predicate acts on the part of Zheng and Wu, evidently because their conduct was insufficiently egregious to qualify as RICO violations.  It is undeniable, however, that criminal copyright infringement is listed as a predicate act under 18 U.S.C. 1961(1)(c).[12]  Moreover, actual indictments for criminal copyright are not so rare as Defendants contend.[13]

---

[12]    "Both Doosan and Sumisho have moved to dismiss plaintiff's RICO counts against them for failure to state a claim, arguing initially that copyright infringement is not a predicate act as required under 18 U.S.C. § 1961.  Both defendants subsequently acknowledged, however, that criminal copyright infringement is listed as a predicate act under 18 U.S.C. 1961(1)(c), and that plaintiff has alleged criminal copyright violations."  *Peter Rosenbaum Photography Corp. v. Otto Doosan Mail Order, Ltd*., 2005 U.S. Dist. LEXIS 21528, *13-14, 76 U.S.P.Q.2D (BNA) 1759, 1763, Copy. L. Rep. (CCH) P29,059 (N.D. Ill. September 26, 2005).

[13]    *See, e.g., United States v. Gallo*, 599 F. Supp. 241, 243, 1984 U.S. Dist. LEXIS 21374, *1, 226 U.S.P.Q. (BNA) 148, 149 (W.D.N.Y. December 10, 1984) (denying motion to dismiss indictment for criminal copyright); *United States v. Bodin*, 375 F. Supp. 1265, 1269, 1974 U.S. Dist. LEXIS 8645, *10, 183 U.S.P.Q. (BNA) 345, 348 (W.D. Okla. May 7, 1974) (Same); *United States v. Drebin*, 557 F.2d 1316, 1333, 1977 U.S. App. LEXIS 12374, *45, 195 U.S.P.Q. (BNA) 619, 630 (9th Cir. Cal. July 21, 1977) (Affirming conviction for criminal copyright infringement); *United States v. Dadamuratov*, 340 Fed. Appx. 540, 541, 2009 U.S. App. LEXIS 16871, *1 (11th Cir. Fla. July 28, 2009) (Same).

Essentially, Defendants' predicate act argument boils down to their opinion that the allegations against Zheng and Wu amount to nothing more than run-of-the-mill copyright violations. Once again, Defendants resort to the TSA, arguing that because Zheng and Wu supposedly could have relied in good faith on the license granted by it, their alleged infringing activities cannot as a matter of law be sufficiently egregious to satisfy RICO. But as shown throughout Patch's submission in opposition to this motion, there are a host of reasons why a reasonable trier of fact could conclude that the TSA was an utter sham and that News Break acted in bad faith when it pressured Torrence to click through it purportedly on behalf of his employer. On the other hand, Plaintiff alleges that Zheng and Wu have molded News Break into an entity whose very raison d'etre is copyright infringement. Once that finding is made, this becomes precisely the type of case where a RICO claim based upon criminal copyright infringement is appropriate.

While there is a judicial gloss on the use of criminal copyright violations as RICO predicates, that gloss arises from the "general adage that courts 'must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing…" and of plaintiffs attempting to "appl[y] [RICO] to commonplace commercial controversies….'" *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 2013 U.S. Dist. LEXIS 107552, at *22 (S.D.N.Y. 2013). The sheer volume and scope of Defendants' conduct -- where they used an enterprise to commit hundreds or thousands of copyright violations a day which infringed the rights of multiple copyright owners -- was not remotely "commonplace." *Compare Helios*, at *23 ("The relatively minor value of the allegedly infringing items, coupled with the overall "run-of-the-mill commercial dispute" tenor of the case … indicates that even if Plaintiffs have adequately alleged

the requisite elements of criminal copyright infringement, it would nonetheless be inappropriate for such infringement to constitute a predicate act for RICO purposes.").

For their part, Defendants rely upon *Palatkevich v. Choupak*, No. 12 Civ. 1681 (CM), No. 12 Civ. 1682 (CM), 2014 U.S. Dist. LEXIS 10570 (S.D.N.Y. Jan. 24, 2014), but there the civil copyright claim had been dismissed, so *a fortiori* the infringement could not constitute a RICO predicate act: "Palatkevich and BPVN's copyright infringement claim has been dismissed because, *inter alia*, they fail to allege that Defendants infringed any copyrights belonging to either Palatkevich or BPVN." (*Id.*, at * 49-50). On our facts, *United States v. Dove*, 2008 U.S. Dist. LEXIS 31386, *2, 2008 WL 1767726 (W.D. Va. April 16, 2008), is more apposite: "The defendant is charged with conspiring with other members of the Elite Torrents organization to infringe copyrighted materials by reproducing and distributing these through the Internet for financial gain." (Denying criminal copyright defendants' motion for new trial). *United States v. Wittich*, 54 F. Supp. 3d 613, 614-615, 2014 U.S. Dist. LEXIS 145784, *1-2 (E.D. La. October 10, 2014), is also on point:

> In this criminal action, the United States has accused defendants Rainer Wittich and The Brinson Company ("TBC") of willfully and for purposes of financial gain: (1) conspiring to infringe a copyright, circumventing a technological measure that effectively controlled access to work protected under Title 17 of the United States Code, and trafficking in a technology designed and produced to circumvent a technological measure that effectively controlled access to a work protected under Title 17 of the United States Code ("Count 1"); (2) infringing copyrighted work, ("Counts 2-3"); and (3) trafficking in technology designed to circumvent copyright protection systems ("Count 4"). Pending before the Court is Defendants Rainer Wittich and the Brinson Company's "Motion to Dismiss." Having considered the pending motions, the memoranda in support, the memoranda in opposition, and the applicable law, the Court will deny the pending motion.

Defendants further argue that Plaintiff has failed to allege willfulness on the part of Zheng and Wu. That is simply inaccurate. (FAC ¶¶ 5, 6, 23, 71, 78, 79, 82-87). *See Peter Rosenbaum Photography Corp. v. Otto Doosan Mail Order, Ltd.*, No. 04 C 0767, 2005 U.S. Dist. LEXIS

21528, at *13-14 ("Doosan argues that the facts do not support a showing of willful infringement, an element of criminal infringement. 17 U.S.C. § 506. Plaintiff has alleged willful infringement, however, and whether the facts ultimately support such a claim is not properly considered on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)."); *see also Architecture v. Amir Constr.*, 2006 U.S. Dist. LEXIS 111351, *26-27 (C.D. Cal. December 8, 2006) ("[I]n *Astor-Honor, Inc. v. Grosset & Dunlap, Inc.*, 441 F.2d 627, 629 (2d Cir. 1971), the Second Circuit acknowledged that a claim for conspiracy to infringe arising under the Copyright Act would not be 'frivolous.'").

Defendants next argue that Plaintiff fails to plead participation by Zheng and Wu in a RICO enterprise. "In *Reves v. Ernst & Young*, the Supreme Court interpreted [participation in a RICO enterprise] to mean that a person 'must have some part in directing [the enterprise's] affairs.' In other words, mere association with an enterprise is not sufficient, but rather, the individual must have participated in some element of direction [of the enterprise]." *C&M Cafe v. Kinetic Farm, Inc.*, 2016 U.S. Dist. LEXIS 161262, *12, 2016 WL 6822071 (N.D. Cal. November 18, 2016) (*Citing Reves*, 507 U.S. 170, 179 (1993) (Some citations and internal quotes omitted). The FAC amply alleges participation on the part of Zheng and Wu. (*See* FAC ¶¶ 5, 6, 23, 26, 35-53, 71, 78, 79, 82-87; *see also* Exhibits R and S to the FAC).[14] The notion that they were innocent bystanders with no concept that News Break's infringing enterprise was illegal should be rejected:

> [A] person of ordinary intelligence would reasonably understand that ... willfully infringing copyrighted works at the market for financial gain, could result in criminal liability, and that intentionally aiding and abetting such conduct could result in the same. *See United States v. White*, 882 F.2d 250, 252 (7th Cir. 1989) (*citing Knutson v. Brewer*, 619 F.2d 747, 750 (8th Cir. 1980)) (holding that in a

---

[14]    While Defendants ask the Court to turn a blind eye to the other copyright infringement lawsuits brought against News Break because the attorneys in those cases did not choose to pursue RICO claims, these litigations are absolutely relevant. (*See* Exhibits R and S to the FAC). Both lawsuits provide additional allegations to support the racketeering claims against Zheng and Wu, who are the masterminds behind News Break's chronic infringement.

Fifth Amendment challenge, "[p]rovided that conduct is of a sort widely known among the lay public to be criminal . . . a person is not entitled to clear notice that the conduct violates a particular criminal statute. It is enough that he knows that what he is about to do is probably or certainly criminal.").

*United States v. Frison*, 825 F.3d 437, 442 (8th Cir. 2016).[15]

Lastly, Defendants argue that Patch has failed to adequately allege an injury to business or property. But here, Patch alleges violations of the Copyright Act and the DMCA. Both statutes allow a plaintiff to recover either actual damages (including the infringer's profits) or statutory damages. *See* 17 U.S.C. § 1203(c)(1), 17 U.S.C. § 504. Of course, only Defendants know the infringer's profits. The only case Defendants cite on this issue is completely inapposite. *See Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132 (2d Cir. 2018) (A liquor distributor does not have a claim against a bootlegger for lower sales). Instead, on point is *C&M Cafe v. Kinetic Farm, Inc.*, 2016 U.S. Dist. LEXIS 161262, *20-21, 2016 WL 6822071 (N.D. Cal. November 18, 2016):

> under the RICO Act, racketeering activity includes "criminal infringement of a copyright." 18 U.S.C. § 1961(1). Given this, it follows that misuse and infringement of trademarks and copyrights can give rise to a legally cognizable injury under RICO. Oppo. at 9. Here, defendants' imposter websites displayed C&M trademarks, service marks, and copyrights. SAC ¶ 16. C&M has alleged that this misuse confused consumers who were likely to believe that they were ordering from C&M's official website when they were not. *Id.* ¶ 42. It has alleged a plausible intellectual property injury.

(Granting in part and denying in part motion to dismiss while finding RICO damages were adequately alleged in connection with copyright violations).

---

[15] While the decision dealt with conspiracy under New Jersey law and not RICO, *Hanover Architectural Serv., P.A. v. Christian Testimony-Morris, N.P.*, No. 2:10-5455 (KM)(SCM), 2015 U.S. Dist. LEXIS 64298, at *54-55 (D.N.J. May 18, 2015), is illustrative: "It is not unreasonable to infer that, if the object of Christian Testimony's conduct was copyright infringement (a disputed issue), then parties involved with the design and construction for the Conversion Project would have known that." (Denying motion for summary judgment to dismiss conspiracy claim).

**C.**     **The FAC Adequately States a Claim for Breach of Contract**

Defendants argue that if not severed, Patch's claim for breach of the NDA should be dismissed.  (Def's MOL p. 30).  As shown above in POINT II(C), severance is disfavored by courts faced with conflicting forum selection clauses.  As for the merits, Defendants' only argument is that the FAC does not allege sufficient facts to give News Break adequate notice as to how it breached the NDA by misusing Patch's confidential information.  (Def's MOL pp. 30-31).  This is incorrect.  Paragraph 25 of the FAC provides detailed allegations regarding the content of the confidential information that Patch provided to News Break and alleges that after "Patch provided News Break with information about how Patch sources, organizes, and distributes local content [] News Break later used [it] to inform its efficient thievery of Patch's content." (*Id.*)  This allegation is highly plausible in light of the ease with which News Break stole Patch content.  The precise manner whereby News Break utilized Patch's confidential information in furtherance of that theft is of course peculiarly within Defendants' knowledge, and can only be further identified through discovery.   In sum, the FAC's "allegations of breach ... are specific enough to satisfy the requirements of Rule 8." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 123 (S.D.N.Y. 2014).[16]

---

[16]     "[E]ven were Plaintiff ... required to demonstrate that more robust factual information was 'peculiarly within the defendant's knowledge or control,' the Court would find that the Complaint's allegations can support such a conclusion." *S'holder Representative Servs. LLC v. Medidata Sols., Inc.*, Civil Action No. 19-1312-RGA, 2020 U.S. Dist. LEXIS 35523, *6 (D. Del. Feb. 24, 2020) (Recommending denial of motion to dismiss breach of contract); "At the pleading stage, ... it is not necessary for the plaintiff to plead the precise measure of damages.  The complaint need only allege facts from which damages may reasonably be inferred." *Fed. Hous. Fin. Agency v. Morgan Stanley ABS Capital I Inc.*, 650291/2013, 2018 NY Slip Op 28067, 59 Misc. 3d 754, 784, 73 N.Y.S.3d 374 (Sup. Ct. Mar. 6, 2018).

**D.**     **The FAC Adequately States a Claim for Fraudulent Inducement**

Defendants argue that their alleged misrepresentations conflict with the unambiguous terms of the TSA, thereby barring Patch's claim for fraudulent inducement. (Def's MOL at 15) (*citing GE v. Compagnie Euralair, S.A.*, 945 F. Supp. 527 (S.D.N.Y. 1996)). In particular, Defendants maintain that the notion that News Break would be limited to using Patch's coronavirus content conflicts with the definition of "content" that the TSA authorized News Break to use. (*Id.*). But the TSA merely defines "content" as being "content from Your websites" – it does not say <u>all</u> such content. (Exhibit E to the FAC at p. 1). Patch's coronavirus content unquestionably was content from its websites. Therefore, the TSA does not state one way or the other, let alone unambiguously, whether News Break would be limited to using Patch's coronavirus content. Further, *GE* and similar authority concern situations where a party to a heavily negotiated agreement seeks to avoid its obligations thereunder by alleging fraud in the inducement. Here, it is disputed based upon plausible allegations whether the TSA is a binding agreement at all. Moreover, a click through agreement that is foisted on a tech specialist who is trying to help establish a working RSS feed is simply not analogous to a situation where sophisticated parties willingly enter into a heavily negotiated contract and then claim fraud.

Defendants generally contend that Patch's fraud allegations fail to satisfy Rule 9(b)'s pleading requirements. In particular, while Defendants acknowledge that allegations of fraud can be made on information and belief about matters peculiarly within a defendant's knowledge if supporting facts are given, they proceed to complain that the certain of the FAC's fraud allegations are made on information and belief. (Def's MOL p. 16). The FAC contains the following detailed factual allegations which support Patch's information and belief:

> This information and belief is based upon, *inter alia*, the following facts: (a) News Break is a technically sophisticated company, (b) its business model entails

utilizing feeds from online news sources and it therefore has extensive experience in doing so, (c) News Break had a motive to fabricate in that it had been seeking to obtain Patch's unfiltered content since before the parties entered into the NDA, (d) based upon the confidential information Patch provided to News Break pursuant to the NDA, News Break was aware of the benefits associated with access to Patch's general feed, and (e) after it secured the general feed, News Break began using all of Patch's content and did not adhere to its agreement to only use Patch's coronavirus content. * * *

This information and belief is based, in part, on the facts that (a) News Break had been able to test the prior feeds from St. John without the need for Patch to create a "publisher profile," and (b) when he claimed that News Break could not "ingest" the feed, Wu never mentioned the supposed "publisher profile" requirement to St. John, who Wu knew did have authority to negotiate, and who had insisted upon having input from counsel with respect to prior negotiations.

(FAC ¶¶ 38, 41).

Further, in terms of the "who, what, when, where, and how," it is undisputed that the relevant events took place on March 20, 2020. Moreover, the FAC exhibited and incorporated by reference the actual email chain containing the false representations to Torrence. Specifically, on March 20, 2020, at 5:28 p.m., Juno Zhu of News Break wrote Torrence that "[a]ll the profiles are going to be manageable under one master account that is associated with one email address, so could you create that account and give us that info? And we'll add the 1200 profiles underneath it and get all the feeds live tomorrow." The same day, at 5:37 P.M., Ms. Zhu wrote Torrence: "Thanks for your prompt reply. I'll still need you to create the account first (see the last paragraph)." (*See* Exhibit D to the FAC at pp. 2-3). While Defendants baldly assert that these communications confirm that creating an account was separate from setting up the feeds (Def's MOL at p. 17), this language simply does not support the conclusion, certainly not as a matter of law – indeed, the feeds could not go live until the day <u>after</u> Torrence created the account.

It is also a fair inference that the fraud was directed towards the forum selection clause itself in light of the care that Patch had taken in the past to ensure that any dispute with News Break be litigated in New York.

Lastly, Defendants argue that Patch fails to allege that News Break could receive a "concrete benefit" from its fraud. (Def's MOL at p. 18). Once again, Defendants elide the FAC's actual allegations, which describe the benefits to Defendants as: "(a) giving News Break access to Patch's general feed to assist News Break in scraping Patch's website and otherwise misappropriating Patch's copyrighted material content, and (b) inducing a Patch technical employee with no authority to negotiate licensing agreements to 'click through' online to a contract of adhesion purporting to give News Break rights with respect to Patch content that News Break knew it did not have." (FAC ¶ 38). Plaintiff's fraud allegations are sufficient.[17]

## POINT IV: THE COURT HAS PERSONAL JURISDICTION OVER ZHENG

### A. The Court Has Personal Jurisdiction Over Zheng Based on Patch's Copyright Claims

"In litigation arising under federal statutes that do not contain their own jurisdictional provisions, such as the Copyright Act ..., federal courts are to apply the personal jurisdiction rules of the forum state, ... provided that those rules are consistent with the requirements of Due Process." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (Citations omitted).

Copyright infringement is a commercial tort that can give rise to jurisdiction under § 302(a)(2). *J. Racenstein & Co., Inc. v. Wallace*, No. 96 Civ. 9222, 1997 U.S.

---

[17] "The facts alleged in the FAC, taken as true, are sufficient to establish that the Schieffelins acted with an intent to deceive and induce Plaintiffs. Because intent is often difficult to establish through direct proof, 'Plaintiff need not come forward with direct evidence' and, instead, need only proffer 'circumstantial evidence and the legitimate inference arising therefrom.'" *Glob. Beauty Grp., LLC v. Visual Beauty, LLC*, 16 Civ. 9214 (KPF), 2018 U.S. Dist. LEXIS 23447, *19-20 (S.D.N.Y. Feb. 12, 2018) (*Quoting Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 222 (S.D.N.Y. 2007).

Dist. LEXIS 14928, 1997 WL 605107, at *2 (S.D.N.Y. Oct. 1, 1997). Indeed, offering "one copy of an infringing work for sale in New York, even if there is no actual sale, constitutes commission of a tortious act within the state sufficient to imbue this court with personal jurisdiction over the infringers." *Editorial Musical Latino Americana, S.A. v. MAR Int'l Records, Inc.*, 829 F.Supp. 62, 64 (S.D.N.Y. 1993).

*Anna Sui Corp. v. Forever 21, Inc*., 07 Civ. 3235 (TPG), 2008 U.S. Dist. LEXIS 73457, at *5 (S.D.N.Y. Sep. 24, 2008).

CPLR § 302, titled "Personal jurisdiction by acts of non-domiciliaries" provides for jurisdiction over

> (a) ... any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
> 3. commits a tortious act without the state causing injury to person or property within the state, ... if he
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; ....

Here, the Court has personal jurisdiction over Zheng under CPLR 302(a)(2) or alternatively (3)(i) and/or (ii), depending on where the Court deems News Break's infringing conduct to have occurred. It is settled that "[a] corporate president who has a financial interest in the company and the ability to supervise or control an infringing activity will be held personally liable." *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*, 829 F. Supp. 62, 66 (S.D.N.Y. 1993) (Holding that "[b]y causing and directing the manufacture and distribution of the Infringing Phonorecord, Sanchez has committed a tort in New York, and maintains the same contacts with New York as does MAR. **Accordingly, he is likewise subject to his Court's personal jurisdiction**.") (Citations omitted) (emphasis supplied).

The FAC alleges that as the founder and CEO of News Break, Zheng "has control over all material business decisions, which include the wrongful conduct alleged herein."  (FAC ¶ 5).  The FAC further alleges that Zheng "actively directed and profited from News Break's infringement" and that "while [he] had the right and ability to stop the infringement, [he] knowingly chose not to do so."  (Id., at ¶ 71).  These allegations are not conclusory, but rather highly plausible considering that as alleged in the FAC, News Break's entire business model is premised upon copyright infringement: "the core of News Break's business model ... consists of scraping websites to obtain content that News Break has no ability or commercially viable way to create (such as hiring local staff as Patch does), and then monetizing the misappropriated content through the News Break website."  (FAC ¶ 80).  As the founder and CEO of a company where copyright infringement is the feature, not a bug, Zheng is clearly profiting from and knowingly failing to stop the infringing activities.  Under the circumstances, Zheng can be held liable for News Break's infringement.[18]

In this case, News Break does not contest the Court's personal jurisdiction over it – indeed, neither does Wu.  News Break's infringing activities are thus jurisdictionally relevant with respect to Zheng.  This concept is well-settled in the context of traditional copyright infringement involving goods sold in the New York forum under CPLR 302(a)(2).  *See AnnaSui Corp.*, *supra*.  In *AnnaSui Corp.*, the plaintiff alleged that a corporate defendant Forever 21 engaged in infringing sales of designer clothes in New York at the direction and supervision of two principals, DWC and

---

[18]     *See Roberts v. Broadwayhd LLC*, No. 19 Civ. 9200 (KPF), 2021 U.S. Dist. LEXIS 24567, *14-15, 2021 U.S.P.Q.2D (BNA) 150, 2021 WL 467292 (S.D.N.Y. February 9, 2021) ("As a matter of law, Plaintiff is correct regarding individual liability for copyright infringement claims. It is well-established that [a] corporate officer can be held liable under a theory of vicarious infringement where he profits from direct infringement while declining to exercise a right to stop or limit it. ... A corporate employee can be held personally liable for copyright infringement under a theory of contributory liability if the officer is a moving, active, conscious force behind the defendant corporation's infringement.") (Citations and internal quotation marks omitted).

JSC. There, as here, it was uncontested that the court has personal jurisdiction over the corporate defendant. (*Id*., at \*6). As the court explained, the operative question was whether "Forever 21 may be considered the agent of defendants, DWC and JSC, so that the purported infringing activities of Forever 21 in New York may be relied on to obtain personal jurisdiction over DWC and JSC under CPLR 302(a)(2)." (*Id*.) "Under New York law 'a corporation can act as the agent of a corporate officer and thus subject the officer to personal jurisdiction under section 302." (*Id.*) (*Quoting Beatie & Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 389 (S.D.N.Y. 2006).

> To assert such an agency theory, a plaintiff must allege: "(1) that the corporation engaged in purposeful activities in New York in relation to the transaction; (2) that the corporation's activities were performed for the benefit of the individual defendant; (3) that the corporation's activities were performed with the knowledge and consent of the individual defendant; and (4) that the individual defendant exercised some control over the corporation."

*AnnaSui Corp.* at \*6-7 (*Quoting Beatie & Osborn*, 431 F. Supp. 2d at 389).

Here, News Break has clearly engaged in purposeful activities in New York based upon the FAC's allegations and supporting documentation that News Break operates websites in New York (FAC ¶ 4) and has (a) chronically infringed Patch copyrighted content through those websites (FAC ¶¶ 58-59), while (b) removing and/or altering "copyright management information with respect to numerous Patch articles and photographs from material published on Patch's New York State-based feeds." (*Id*., at ¶ 61 and Exhibits I-Q to the FAC). Thus, the first prong is clearly met.

As discussed above, Patch also sufficiently alleges that News Break's infringing activities were performed for Zheng's benefit and with his knowledge and consent, thus satisfying the third and fourth prongs. (*See* FAC at ¶¶ 5, 70, and 79).[19] Patch has also satisfied the "control" prong

---

[19]    *See AnnaSui Corp.*, at \* 7-8:

of the agency test. (*See* FAC at ¶¶ 5, 70, and 79). Under New York law, a "corporate president who has a financial interest in the company and the ability to supervise or control an infringing activity will be held personally liable." *Colour & Design v. U.S. Vinyl Mfg. Corp.*, No. 04 Civ. 8332, 2005 U.S. Dist. LEXIS 10964, *6, 2005 WL 1337864, at *3 (S.D.N.Y. June 3, 2005). *See also AnnaSui Corp.*, at *7-8 (Finding that the plaintiff met the "control" prong because "DWC and JSC are both high ranking officials and primary owners of Forever 21.") (Citing *Colour & Design*, *supra*).

Notably, these same principles have been applied to uphold personal jurisdiction over the corporate officer of an infringer in the context of traditional print media publications distributed within the State of New York: "In brief, plaintiff alleges that at the direction of defendant SerVaas the corporation committed tortious acts (obtaining the portrait from plaintiff and subsequently distributing reproductions without proper authority) within the state. Should these allegations be established jurisdiction would, in the circumstances of this case, attach under CPLR § 302(a)(2)." *Kinstler v. Saturday Evening Post Co.*, 507 F. Supp. 113, 115 (S.D.N.Y. 1981) (Denying motion of officer of publisher to dismiss for lack of personal jurisdiction).

Patch's allegations are analogous to the circumstances in *Kintsler* because News Break operates localized websites for content distributed to users located in the New York forum. (*See* FAC at ¶ 4: "At all times relevant to this action, it has engaged in a continuous and systematic

---

Plaintiff has also satisfied the "benefit" prong of the agency test by alleging that Forever 21 is primarily owned by DWC and JSC, and thus that they both derive financial benefit from the sale of Forever 21 goods in New York, including the sale of infringing designs. Plaintiff also adequately alleges that the infringing conduct of Forever 21 was performed with the knowledge and consent of DWC and JSC. Among other things, plaintiff alleges that DWC and JSC have an ownership interest in One Clothing, the largest vendor to Forever 21 and a vendor identified as the source of infringing designs.

course of business in New York State and has also transacted business in New York by operating the web sites for New Yorkers which is the basis for Plaintiff's claims in this action.").  Indeed, the FAC alleges significant removal and/or altering of Patch "copyright management information with respect to numerous Patch articles and photographs from material published on Patch's New York State-based feeds."  (FAC at ¶ 61 and Exhibits I-Q to the FAC).  News Break is thus distributing infringing content within the forum while seeking to cover its tracks by systematically removing copyright information.  Patch's principal place of business is located in New York City. (*See* St. John Dec. ¶ 2).  Accordingly, New York is the situs of Patch's injury.  *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 301-02 (2011) (Holding in response to a certified question from the Second Circuit that the location of a copyright holder's injury for the uploading of a copyrighted work on the internet is the location of the copyright holder).  Therefore, by publishing websites in the New York forum that contain stolen Patch content, Zheng is subject to personal jurisdiction under CPLR 302(a)(2).  *See Kinstler, supra*.

However, if this Court were to determine that Defendants' infringing conduct occurs outside of New York State despite News Break's publication of websites in the New York forum, CPLR 302(a)(3)(i) and (ii) provide alternate grounds for the Court's personal jurisdiction over Zheng.  Because Patch is based in New York, for both CPLR 302(a)(3)(i) and (ii), Patch's injury occurred within the State.  *See Penguin Grp. (USA) Inc.*  Based upon the websites News Break publishes in the forum with the express goal of securing New York subscribers, it cannot reasonably be disputed that News Break "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state."  (*See* CPLR 302(a)(3)(i)).  Alternatively, News Break "expects or should reasonably expect [its] act[s] to have consequences in the state and derives substantial

revenue from interstate or international commerce." (*See* CPLR 302(a)(3)(ii)). In this regard, Patch is located in New York and News Break is infringing Patch's New York content in an effort to obtain revenue in connection with New York based users. Thus, News Break should at a minimum reasonably expect its infringing activity to have consequences in the State of New York.

Moreover, upon information and belief based in part on News Break's own January 7, 2021 press release, News Break derives substantial revenue from interstate commerce. (*See* Exhibit A to the Schalk Dec.). News Break's press release states that it closed on a $115 million round of Series C funding in early 2021. The press release further describes News Break as "[t]he Nation's No. 1 Intelligent Local News App." (*Id.*). Based on the foregoing, at a minimum, Plaintiff would be entitled to jurisdictional discovery about, *inter alia*, News Break's finances both nationally and with respect to the New York forum. (*See* CPLR 302(a)(3)(i) and (ii); *see also* discussion *infra* at POINT IV Subsection (C)).

## B.     The Court's Assertion of Personal Jurisdiction Over Zheng Comports with Due Process

The assertion of jurisdiction comports with due process if defendant has made "some act by which [he] purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and the protection of its laws." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 82 (2d Cir. 1993) (quotation omitted). "[D]efendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980). "Once minimum contacts have been established, the reasonableness of the exercise of jurisdiction must be determined by an evaluation of several factors including the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." (*A.I. Trade Fin., Inc.*, 989 F.2d at 83) (quotation omitted).

Here, it is alleged that Defendants engaged in significant infringing activities in the forum and misappropriated Patch content that was specifically created for New York users while removing copyright information to hide their thievery. The New York courts have an interest in protecting New York based businesses from unlawful infringement. Zheng is the CEO and founder of News Break which recently raised $115 million in new funding. (Exhibit A to Schalk Dec.) All Defendants are being represented by the same law firms and can plainly afford to litigate here. Moreover, Zheng knew that News Break signed the NDA in which it not only submitted to the jurisdiction of the New York courts, but expressly represented that "any such courts are a convenient forum...." (Exhibit A to the FAC at p. 2, § 10). Additionally, with more court proceedings occurring remotely at present in light of the pandemic, the burden on litigating in a different forum is lessened. As such, this Court's assertion of personal jurisdiction is constitutionally permissible, certainly at the pleading stage. *See, e.g., Real Good Toys, Inc. v. Xl Mach., Ltd.*, 163 F. Supp. 2d 421, 425-26 (D. Vt. 2001) (Holding that at an early litigation state, plaintiff made a *prima facie* showing of facts sufficient that the assertion of personal jurisdiction over a Hong Kong corporation and its out-of-state CEO for copyright infringement comported with Due Process).

**C.** **Alternatively, Plaintiff is Entitled to Jurisdictional Discovery**

**CONCLUSION**

WHEREFORE, the Court should deny Defendants' motion in its entirety together with such other and further relief as the Court deems just and proper.

Dated: April 14, 2021
New York, New York

Respectfully Submitted,
JUDD BURSTEIN, P.C.

By:  /s/ Judd Burstein

Peter B.Schalk